**UNITED STATES of America,
Plaintiff,**

v.

**Jose OCHOA–HEREDIA, Defendant.**

**No. CR 99–4069–MWB.**

United States District Court,
N.D. Iowa,
Western Division.

Jan. 3, 2001.

Shawn Wehde, Assistant United States Attorney, Waterloo, IA, for Plaintiff.

Teresa A. O'Brien, Sioux City, IA, for Defendant.

**MEMORANDUM SENTENCING
OPINION**

BENNETT, Chief Judge.

**TABLE OF CONTENTS**

I.  *INTRODUCTION* ....................................................893
    A.  *Factual Background* .........................................893
    B.  *Procedural Background* ......................................894

II. *LEGAL ANALYSIS* .................................................895
    A.  *Suggestions From Supreme Court Precedent* ...................896
        1.  *Chapman* ...............................................896
        2.  *Neal* .................................................898

    B.   *Decisions Of The Circuit Courts Of Appeals* ............................ 901
        1.   *Eighth Circuit precedent* ........................................ 901
        2.   *Richards and plain meaning* ................................... 903
            a.   *The majority decision* ...................................... 903
            b.   *The dissenting opinions* ................................... 907
        3.   *Other circuits and the "unusable/unmarketable rule"* ............... 909
            a.   *The Tenth Circuit Court of Appeals after Richards* .............. 909
            b.   *The First Circuit Court of Appeals* .......................... 910
            c.   *Courts adopting the "unusable/unmarketable rule"* ............... 911
                i.   *Pre-amendment applications of the rule* ..................... 911
                ii.   *Post-amendment applications* ............................... 921
    C.   *Applicability Of The "Unusable/Unmarketable Rule* ..................... 923
        1.   *Proper framing of the question* ................................. 924
        2.   *Plain meaning and legislative intent* ............................. 925
        3.   *Guidance of other courts* ...................................... 927

III.  *CONCLUSION* .................................................... 929

In the course of interpreting certain language in 38 U.S.C. § 445, Justice William O. Douglas observed, "[C]ommon sense often makes good law." *Peak v. United States,* 353 U.S. 43, 46, 77 S.Ct. 613, 1 L.Ed.2d 631 (1957). This court believes that common sense also makes good law in the interpretation of 21 U.S.C. § 841, where a defendant's mandatory minimum sentence for possession of methamphetamine with intent to distribute it under § 841 depends upon whether the court "counts" the weight of over 3,000 grams of a toxic medium or only the 26.2 grams of actual (pure) methamphetamine contained in the medium. The Circuit Courts of Appeals to consider the question are split on the proper interpretation of the mandatory minimum sentencing provisions of § 841 when a medium containing a controlled substance is unusable or unmarketable. However, a majority of those courts has adopted the "unusable/unmarketable rule," which excludes from the calculation of drug quantity the weight of any medium that prevents the controlled substance from being usable or marketable without further processing. Because this court must not "produce a result demonstrably at odds with the intentions of [a statute's] drafters," *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), this court also adopted the "unusable/unmarketable rule" at the defendant's sentencing hearing and imposed a mandatory minimum sentence of five years based upon the weight of the actual (pure) methamphetamine contained in the toxic medium, rather than the ten-year mandatory minimum sentence, advocated by the government, based upon the weight of the entire toxic medium containing the methamphetamine. The court deems it appropriate to explain in this written ruling why the "plain meaning" of § 841, the rules of statutory interpretation, and the Supreme Court's reading of the statute as applied to LSD in *Chapman v. United States,* 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), when viewed from a common sense perspective, dictated this court's conclusion on the complicated question of the applicable mandatory minimum sentence in this case.

## I. INTRODUCTION

### A. Factual Background

Defendant Jose Ochoa–Heredia and a co-defendant were passengers in a taxicab with Douglas County, Nebraska, license plates and a large advertisement for an Omaha radio station in its back window when the taxicab was stopped by a Trooper with the Iowa State Patrol for speeding on Interstate 29 near Sioux City, Iowa, on October 31, 1999. The driver of the taxicab explained to the State Trooper that he had picked up his two passengers at a bus depot in Omaha, and that they had asked him to drive them to Sioux City, where

they said they were going to work in a packing house. Ochoa–Heredia was carrying a resident alien card and his companion had a California driver's license.

When the State Trooper asked Ochoa–Heredia and his companion if they would mind opening their bags, Ochoa–Heredia agreed. The taxicab driver opened the trunk of the vehicle revealing three duffle bags, one brown, one light teal, and one dark teal in color. Ochoa–Heredia identified two of the bags as his, the brown one and the light teal one, but a search of those bags revealed nothing. When the State Trooper started to ask Ochoa–Heredia another question, Ochoa–Heredia opened the third bag as well, the dark teal one, revealing a cylindrical object, the size and shape of a soda bottle, wrapped in duct tape and Saran Wrap. Ochoa–Heredia denied knowing what the object was and both he and his companion denied ownership of the dark teal bag. However, the taxicab driver asserted that the trunk of the taxicab had been empty before he picked up the two men in Omaha. Upon a search of the dark teal bag, the State Trooper found six more suspicious bottles. A drug dog called to the scene "hit" on the bag in which the suspicious bottles were located and a field test of some of their contents was positive for methamphetamine. Ochoa–Heredia and his companion were then arrested.

A criminalist in the chemistry section of the Iowa Department of Criminal Investigation (DCI) Criminalistics Laboratory testified at the trial of Ochoa–Heredia's companion that the bottles contained approximately 20.8 grams of actual (pure) methamphetamine in some sort of medium, but that the total weight of the methamphetamine and the medium was in excess of 3,000 grams. *See* Trial Transcript, United States v. Huerta–Orozco, No. CR 99–4069, Excerpt of Testimony of Staci Schmeiser, p. 21, *l.* 7 to p. 23, *l.* 21; *see*

*also* Government's Trial Exhibit 19. The criminalist testified that the results of an initial test of the medium were "consistent with freon," but that she did not have a standard of freon to run in the laboratory to confirm that analysis. *Id.* at p. 20, *l.* 17; *see also id.* at p. 24, *l.* 2–12. At Ochoa–Heredia's sentencing hearing, the parties stipulated on the record that the medium, whether freon or not, was toxic, and that further processing would be required to remove the pure methamphetamine from the medium before the methamphetamine could be used.[1]

### B. Procedural Background

Ochoa–Heredia and his companion were indicted on November 17, 1999, on a one-count indictment charging them with possession of 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine with intent to distribute it. On December 22, 1999, the defendants filed a joint motion to suppress much of the evidence from the traffic stop of the taxicab, including the bottles containing methamphetamine and the unknown medium. On April 18, 2000, the undersigned accepted in part a report and recommendation by a magistrate judge on the defendants' motion to suppress. Specifically, the undersigned (1) denied the defendants' motion with respect to all evidence secured as a result of the search of the duffle bag in which the methamphetamine was found; (2) denied the motion with respect to any statements made by the defendants up to the point at which the first bottle containing methamphetamine was found and Ochoa–Heredia's co-defendant was told to take a seat in the taxicab; but (3) granted the motion as to any statements made by either of the defendants after the first bottle containing methamphetamine was found and Ochoa–Heredia's co-defendant was told to take a seat in the taxicab.

---

1. Ochoa–Heredia's counsel also represented, and the government did not contest, that Ochoa–Heredia does not know how to pro- cess the methamphetamine out of the medium.

The trial of Ochoa–Heredia and his companion was originally scheduled to begin on July 3, 2000. However, shortly before that trial date, Ochoa–Heredia decided to plead guilty to the offense charged. Ochoa–Heredia pleaded guilty before a magistrate judge on September 14, 2000. The undersigned accepted the magistrate judge's report and recommendation regarding the guilty plea on October 2, 2000. Ochoa–Heredia's co-defendant elected to go to trial. After a jury trial that began on October 31, 2000, he was convicted on the offense charged on November 2, 2000.

Ochoa–Heredia came on for sentencing pursuant to his guilty plea on December 21, 2000. At the sentencing, the United States withdrew some of its objections to the pre-sentence investigation report (PSIR) prepared by the United States Probation Office and advised the court that the parties had stipulated to a base offense level of 26 and a criminal history category of 1. The government also stipulated that the mixture or substance at issue in Ochoa–Heredia's offense contained approximately 26.2 grams of actual (pure) methamphetamine.[2] In essence, the government's remaining objections to the PSIR boiled down to the government's contention that the mandatory minimum sentence for the offense to which Ochoa–Heredia had pleaded guilty is ten years, while Ochoa–Heredia argued for, and the Probation Office had computed, a mandatory minimum sentence of five years. The difference arose from the government's contention that the mandatory minimum sentence should be based on the weight of the entire mixture or substance in which the methamphetamine was detected, more than 3,000 grams, while Ochoa–Heredia and the Probation Office advocated a mandatory minimum sentence based only on the weight of the actual (pure) methamphetamine contained in the bottles, that is, 26.2 grams.

The court concluded at Ochoa–Heredia's December 21, 2000, sentencing hearing, based on its review of the facts in this case and the legal authorities the court found most persuasive, that the weight of the medium should be excluded from the calculation of Ochoa–Heredia's mandatory minimum sentence. Therefore, based on a finding that the offense involved approximately 26.2 grams of actual (pure) methamphetamine, the court sentenced Ochoa–Heredia to a mandatory minimum sentence of five years' imprisonment pursuant to 21 U.S.C. § 841(b)(1)(B)(viii).[3] The court now commits to writing its rationale for this conclusion on the complicated question of the applicable mandatory minimum sentence in this case.

## II. LEGAL ANALYSIS

The government contends—albeit without the benefit of filing a brief, or even a list of authorities—that, in this case, inclusion of the entire weight of the medium in the bottles is required by the plain language of 21 U.S.C. § 841(b), and that such a reading of the statute is supported by an

2. More specifically still, at the sentencing hearing, the government withdrew its objections to the following paragraph of the PSIR:

    14. The substances were sent to the Iowa Department of Public Safety DCI Criminalistics Laboratory for testing. Lab testing determined the six bottles contained a total of 3,508 ml of liquid substance. On October 18, 2000, U.S. Probation contacted Stacy Schmeiser, the laboratory technician who preformed [sic] the testing on this substance. Ms. Schmeiser advised the liquid in the bottle needed to be mixed with acid to complete the methamphetamine manufacturing process before

it could be used. She reports that upon the completion of this process there would have been a total of 26.2 grams of "actual" methamphetamine.

Presentence Investigation Report (PSIR), ¶ 14.

3. Under U.S.S.G. § 5G1.1(b), the statutory mandatory minimum sentence in this case "trumped" Ochoa–Heredia's sentencing range of 46 to 57 months under the United States Sentencing Guidelines, which was based on the parties' stipulation to a base offense level of 26, criminal history category of 1, and other pertinent considerations.

*en banc* decision of the Tenth Circuit Court of Appeals. Ochoa–Heredia,[4] however, relies on various decisions of other Circuit Courts of Appeals espousing a "marketability" or "usability" method for determining drug quantity for purposes of mandatory minimum sentences under 21 U.S.C. § 841(b), which excludes from the calculation of drug quantity the weight of any medium that prevents the controlled substance from being usable or marketable without further processing. The parties recognize that there is a split in authority among the Circuit Courts of Appeals to consider the question of the applicability of this "unusable/unmarketable rule" to mandatory minimum sentences, and that the Eighth Circuit Court of Appeals has not settled the question in this Circuit. Therefore, this court must examine authorities on both sides of the split to resolve the question of the appropriate mandatory minimum sentence in this case.

### A. Suggestions From Supreme Court Precedent

Two Supreme Court decisions, *Chapman v. United States*, 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), and *Neal v. United States*, 516 U.S. 284, 116 S.Ct. 763, 133 L.Ed.2d 709 (1996), which concerned determination of mandatory minimum sentences for drug trafficking offenses involving LSD, provide some guidance on the question presented here— indeed, some courts hold that they are controlling on the question. Therefore, this court's analysis begins with the decisions in *Chapman* and *Neal*.

### 1. Chapman

In *Chapman*, the defendants were convicted of selling 10 sheets of blotter paper containing 1,000 doses of LSD in violation of 21 U.S.C. § 841(a). *Chapman*, 500 U.S. at 455, 111 S.Ct. 1919. Although the LSD alone weighed only about 50 milligrams,

the blotter paper in which the LSD was contained weighed 5.7 grams, and the district court's use of the weight of the blotter paper resulted in a mandatory minimum sentence of five years pursuant to 21 U.S.C. § 841(b)(1)(B)(v). *Id.* at 455–56, 111 S.Ct. 1919. Before the Supreme Court, the defendants contended that the blotter paper was only a carrier medium, and that its weight should not have been included in the weight of the drug for sentencing purposes. *Id.* at 456, 111 S.Ct. 1919. The Court rejected the defendants' argument, holding instead "that it is the weight of the blotter paper containing LSD, and not the weight of the pure LSD, which determines eligibility for the minimum sentence." *Id.* at 455, 111 S.Ct. 1919. Because this holding would seem to suggest that, in Ochoa–Heredia's case, this court must use the weight of the medium containing the methamphetamine to determine the mandatory minimum sentence, not simply the weight of the actual (pure) methamphetamine contained in the medium, as Ochoa–Heredia contends, the Supreme Court's reasoning in *Chapman* should be considered in more detail.

In *Chapman*, the Court noted that a pure dose of LSD is such an infinitesimal amount that it must be sold to retail customers in a "carrier," such as blotter paper, which the user either licks, ingests, or drops in a beverage to release the LSD. *Id.* at 457, 111 S.Ct. 1919. The defendants argued that § 841(b) should not require the inclusion of the weight of the carrier when computing the appropriate sentence for LSD distribution, on the ground that the words "mixture or substance" in the statute were ambiguous and should not be construed to reach an illogical result, such as lower sentences for wholesalers caught with thousands of doses of LSD in pure form, and hence low weight, versus a minor pusher with few doses in a medium that increased the total weight of the "mix-

---

4. Unlike the government, well in advance of the sentencing hearing, Ochoa–Heredia provided the court with a "letter brief" laying out his arguments and identifying the authorities on which he relied.

ture or substance" past the amount required to trigger a mandatory minimum sentence. *Id.* at 458, 111 S.Ct. 1919.

The Court, however, concluded that the defendants' reading of the statute was "not a plausible one," because the statute refers to a "mixture or substance containing a detectable amount," and, "[s]o long as it contains a detectable amount, the entire mixture or substance is to be weighed when calculating the sentence." *Id.* at 459, 111 S.Ct. 1919. The Court "confirmed" this reading by comparing the mandatory minimum sentencing provision for LSD, heroin, and cocaine, with that for other drugs, such as methamphetamine and PCP: the provision for the first group of controlled substances refers only to a "mixture or substance containing a detectable amount" of the illegal substance, while that for methamphetamine and PCP provides for a mandatory minimum based either on the weight of a "mixture or substance containing a detectable amount" or the weight of the actual (pure) drug involved. *Id.* Thus, the Court concluded, "Congress knew how to indicate that the weight of the pure drug was to be used to determine the sentence, and did not make that distinction with respect to LSD." *Id.* The Court reasoned that, as to LSD, cocaine, and heroin, "Congress clearly intended the dilutant, cutting agent, or carrier medium to be included in the weight of those drugs for sentencing purposes." *Id.* at 459–60, 111 S.Ct. 1919. The Court recognized that, "[i]n some cases, the concentration of the drug in the mixture is very low, … [b]ut, if the carrier is a 'mixture or substance containing a detectable amount of the drug,' then under the language of the statute the weight of the mixture or substance, and not the weight of the pure drug, is controlling." *Id.* at 460, 111 S.Ct. 1919 (internal citations omitted).

Looking next to legislative history, and specifically to the "history of Congress' attempts to control illegal drug distribution," the Court found that, in the Anti-Drug Abuse Act of 1986, Pub.L. 99–570, 100 Stat. 3207, "Congress adopted a 'market-oriented' approach to punishing drug trafficking, under which the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence." *Id.* at 461, 111 S.Ct. 1919 (citing H.R.Rep. No. 99–845, pt. 1, p. 11–12, 17 (1986)). As a result, "Congress set mandatory minimum sentences corresponding to the weight of a 'mixture or substance containing a detectable amount of' the various controlled substances" in 21 U.S.C. §§ 841(b)(1)(A)(i)–(viii) and (B)(i)–(viii). *Id.* Congress's intent, the Court concluded, was for "the penalties for drug trafficking to be graduated according to the weight of the drugs in whatever form they were found—cut or uncut, pure or impure, ready for wholesale or ready for distribution at the retail level. Congress did not want to punish retail traffickers less severely, even though they deal in smaller quantities of the pure drug, because such traffickers keep the street markets going." *Id.* (citing H.R.Rep. No. 99–845, pt. 1, p. 12 (1986)).

Moreover, in the particular case then before it, the Court concluded that "the blotter paper used in this case, and blotter paper customarily used to distribute LSD, is a 'mixture or substance containing a detectable amount' of LSD." *Id.* at 461, 111 S.Ct. 1919. The Court found that neither "mixture" nor "substance" is defined in the statute or by common law, and thus, both terms must be given their "ordinary meaning." *Id.* at 461–62, 111 S.Ct. 1919.

A "mixture" is defined to include "a portion of matter consisting of two or more components that do not bear a fixed proportion to one another and that however thoroughly commingled are regarded as retaining a separate existence." Webster's Third New International Dictionary 1449 (1986). A "mixture" may also consist of two substances blended together so that the particles of one are diffused among the particles of the other. 9 Oxford En-

glish Dictionary 921 (2d ed.1989). LSD is applied to blotter paper in a solvent, which is absorbed into the paper and ultimately evaporates. After the solvent evaporates, the LSD is left behind in a form that can be said to "mix" with the paper. The LSD crystals are inside of the paper, so that they are commingled with it, but the LSD does not chemically combine with the paper. Thus, it retains a separate existence and can be released by dropping the paper into a liquid or by swallowing the paper itself. The LSD is diffused among the fibers of the paper. Like heroin or cocaine mixed with cutting agents, the LSD cannot be distinguished from the blotter paper, nor easily separated from it. Like cutting agents used with other drugs that are ingested, the blotter paper, gel, or sugar cube carrying LSD can be and often is ingested with the drug.

*Chapman,* 500 U.S. at 462, 111 S.Ct. 1919. The Court rejected the defendants' suggestion that the dictionary definitions of "mixture" and "substance" should not control, because those definitions could be construed to include carriers such as glass vials or an automobile. The Court concluded that "such nonsense is not the necessary result of giving the term 'mixture' its dictionary meaning. The term does not include LSD in a bottle or LSD in a car, because the drug is easily distinguished from, and separated from, such a 'container,' " and no mixing or chemical bonding between the drug and the glass vial or automobile has occurred. *Id.* at 462–63, 111 S.Ct. 1919. Nor did a straightforward reading of the statute produce an absurd or unjust result requiring application of the rule of lenity, which may only be in-

voked to construe an ambiguous statute. *Id.* at 463, 111 S.Ct. 1919. Finally, the Court rejected various constitutional challenges to the statute, which are not at issue here. *Id.* at 464–68, 111 S.Ct. 1919.[5]

Before considering the impact of *Chapman* on the present case, it is appropriate to consider its sibling, *Neal,* and its progeny in the various Circuit Courts of Appeals, where the courts have considered application of *Chapman* to circumstances involving drugs other than LSD.

### 2. Neal

Like *Chapman,* the Supreme Court's decision in *Neal v. United States,* 516 U.S. 284, 116 S.Ct. 763, 133 L.Ed.2d 709 (1996), involved calculation of the weight of LSD for purposes of sentencing, albeit in a unanimous decision. The critical issue, however, was whether the Court's interpretation of § 841(b), for purposes of calculating the quantity of LSD applicable to determination of mandatory minimum sentences, as set forth in *Chapman,* had been changed by a 1993 amendment to the United States Sentencing Guidelines, which revised the method of calculating the weight of LSD for purposes of sentencing under the Sentencing Guidelines. *See Neal,* 516 U.S. at 285–87, 116 S.Ct. 763. The amendment to the Guidelines, effective retroactively, "[d]eparting from its former approach of weighing the entire mixture or substance containing LSD, ... instructed courts to give each dose of LSD on a carrier medium a constructive or presumed weight of 0.4 milligrams." *Id.* at 287, 116 S.Ct. 763 (citing U.S.S.G. § 2D1.1(c), n. (H), as amended by Amendment 488). On a motion to modify sentence, the defendant in *Neal* contended

---

**5.** Justice Stevens filed a vigorous dissent, joined by Justice Marshall, which criticized the majority's holding, in part, as follows:

> The consequences of the majority's construction of 21 U.S.C. § 841 are so bizarre that I cannot believe they were intended by Congress. Neither the ambiguous language of the statute nor its sparse legislative history supports the interpretation reached by

> the majority today. Indeed, the majority's construction of the statute will necessarily produce sentences that are so anomalous that they will undermine the very uniformity that Congress sought to achieve when it authorized the Sentencing Guidelines.

*Chapman,* 500 U.S. at 468, 111 S.Ct. 1919 (Stevens, J., dissenting).

that application of the amended Sentencing Guideline to the quantity of LSD in his case reduced the quantity involved well below the amount necessary to impose a ten-year mandatory minimum sentence. *Id.* The district court, however, read *Chapman* to require consideration of the weight of the blotter paper used as a carrier medium in the defendant's case to determine the mandatory minimum sentence, which consequently was ten years, but the district court reduced the defendant's sentence to the mandatory minimum, because the Sentencing Guidelines no longer authorized a sentence in excess of the ten-year mandatory minimum. *Id.* at 287–88, 116 S.Ct. 763. On appeal, the Seventh Circuit Court of Appeals, sitting *en banc,* like the district court, had concluded that "a dual system now prevails in calculating LSD weights in cases like this," that is, one system for determining the weight for mandatory minimum sentences and another system for determining weight for purposes of setting the sentencing range under the Sentencing Guidelines. *Id.* at 288, 116 S.Ct. 763.

The Supreme Court "granted certiorari to resolve a conflict in the Courts of Appeals over whether the revised Guideline governs the calculation of the weight of LSD for purposes of § 841(b)(1)." *Id.* The Court in *Neal* concluded that its determination of the issue was controlled by *Chapman:*

> In *Chapman,* we interpreted the provision of the Act that provided a mandatory minimum sentence of five years for trafficking in an LSD "mixture or substance" that weighed one gram or more, *see* § 841(b)(1)(B)(v). We construed "mixture" and "substance" to have their ordinary meaning, observing that the terms had not been defined in the statute or the Sentencing Guidelines and had no distinctive common-law meaning. 500 U.S. at 461–462, 111 S.Ct. at 1925–1926. Reasoning that the "LSD is diffused among the fibers of the paper ... [and] cannot be distinguished from the

blotter paper, nor easily separated from it," *id.,* at 462, 111 S.Ct. at 1926, we held that the actual weight of the blotter paper, with its absorbed LSD, is determinative under the statute, *id.,* at 468, 111 S.Ct. at 1929.

*Neal,* 516 U.S. at 289, 116 S.Ct. 763.

The Court in *Neal* rejected the defendant's assertion that the method approved in *Chapman* for calculation of mandatory minimum sentences for LSD was no longer appropriate in light of the Sentencing Commission's amendment to the applicable Sentencing Guidelines. *Id.* at 289–90, 116 S.Ct. 763.

> While acknowledging that the Commission's expertise and the design of the Guidelines may be of potential weight and relevance in other contexts, we conclude that the Commission's choice of an alternative methodology for weighing LSD does not alter our interpretation of the statute in *Chapman.* In any event, principles of *stare decisis* require that we adhere to our earlier decision.

*Neal,* 516 U.S. at 290, 116 S.Ct. 763. More specifically, the Court noted that, although the goal of the Sentencing Guidelines— " 'proportional' " and " 'finely calibrated' " sentences—was at odds with the function of mandatory minimum sentences, *see id.* at 291–92, 116 S.Ct. 763 (quoting United States Sentencing Commission, Special Report To Congress: Mandatory Minimum Penalties In The Federal Criminal Justice System 26 (Aug. 1991)), "the Commission has sought to make the Guidelines parallel to the scheme of § 841(b)(1) in most instances." *Id.* (citing U.S.S.G. § 2D.1.1, cmt., n. 10). Moreover,

> As a general rule, the Commission adopts the same approach to weighing drugs as the statute does: "Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." 1995 USSG § 2D1.1(c), n. (A); *see also* 1995 USSG § 2D.1.1, comment., n. 1

(" 'Mixture or substance' as used in this guideline has the same meaning as in 21 U.S.C. § 841, except as expressly provided"); 1987 USSG § 2D1.1, n. * (weighing rule intended to be "[c]onsistent with the provisions of the Anti-Drug Abuse Act"). For most narcotics, there will be no inconsistency in the calculations of drug quantities. *Neal,* 516 U.S. at 292, 116 S.Ct. 763.

The Court noted that the Commission had found LSD to be an exception, requiring departure from the general rule, if the Sentencing Guidelines were to fulfill their goal to promote proportionate sentencing. *Id.* Consequently, the Commission had amended the Sentencing Guidelines, for purposes of determining sentencing ranges, to disregard the weight of a "carrier medium" in the calculation of the weight of LSD, and instead, to treat each dose of LSD on a carrier medium as equal to 0.4 mg of LSD. *Id.* at 293, 116 S.Ct. 763 (citing U.S.S.G. § 2D1.1(c), n. (H)).

The Court expressed its doubt that, in amending the Guideline to provide a presumptive weight for each dose of LSD, the Commission had intended to displace the "actual weight method that *Chapman* requires for statutory minimum sentences," *id.,* not least because the Commission had itself observed that " 'this approach [for Sentencing Guidelines purposes] does not override the applicability of "mixture or substance" for the purpose of applying any mandatory minimum sentence (*see Chapman;* § 5G1.1(b)).' " *Id.* at 294, 116 S.Ct. 763 (quoting 1995 U.S.S.G. § 2D1.1, cmt., backg'd). The Court also concluded that "[t]he Commission's dose-based method cannot be squared with *Chapman.*" *Id.*
In these circumstances, we need not decide what, if any, deference is owed the Commission in order to reject its alleged contrary interpretation. Once we have determined a statute's meaning, we adhere to our ruling under the doctrine of *stare decisis,* and we assess an agency's later interpretation of the statute against that settled law. *Lechmere, Inc.*

*v. NLRB,* 502 U.S. 527, 536–537, 112 S.Ct. 841, 847–848, 117 L.Ed.2d 79 (1992); *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 131, 110 S.Ct. 2759, 2768, 111 L.Ed.2d 94 (1990).

*Neal,* 516 U.S. at 295, 116 S.Ct. 763. Consequently, the Court held "that § 841(b)(1) directs a sentencing court to take into account the actual weight of the blotter paper with its absorbed LSD, even though the Sentencing Guidelines require a different method of calculating the weight of an LSD mixture or substance," thus affirming the judgment of the Seventh Circuit Court of Appeals, which had recognized a "dual system" for determining drug quantity in LSD cases. *Id.* at 296, 116 S.Ct. 763.

*Neal* thus suggests, first, that the "actual weight" method established in *Chapman,* which considers the weight of the medium in which a detectable amount of a controlled substance is found in calculating the weight of the drug, is controlling for purposes of determining a mandatory minimum sentence under § 841(b), at least for LSD, whatever different or contrary method may be established by the Sentencing Guidelines. Second, *Neal* stands for the proposition that a "dual system" for calculation of drug quantity may obtain, and in fact does obtain for LSD: The *Chapman* method applies to determinations of quantity for purposes of statutory mandatory minimum sentences, while any different or contrary method of determining drug quantity under the Sentencing Guidelines applies only to determination of sentencing range.

The present dispute over the weight of methamphetamine for purposes of a mandatory minimum sentence plays out in the context of the decisions in *Chapman* and *Neal,* although both of those cases involved LSD on an ingestible "carrier," while the present case involves methamphetamine contained in a toxic medium from which the methamphetamine could only be retrieved and made usable by further processing. Thus, the question presented

here is whether these factual distinctions make a difference in the way this court should calculate the weight of methamphetamine involved for purposes of determining Ochoa–Heredia's mandatory minimum sentence.

That question is also presented in a different context than it was in *Chapman.* After the Supreme Court's decision in *Chapman,* the United States Sentencing Commission amended U.S.S.G. § 2D1.1, effective November 1, 1993, to redefine "mixture or substance" for purposes of the Sentencing Guidelines to exclude "materials that must be separated from the controlled substance before the controlled substance can be used." *See, e.g., United States v. Jackson,* 115 F.3d 843, 846 (11th Cir.1997). The amended application note, in its entirety, now states the following:

> "Mixture or substance" as used in this guideline has the same meaning as in 21 U.S.C. § 841, except as expressly provided. Mixture or substance does not include materials that must be separated from the controlled substance before the controlled substance can be used. Examples of such materials include the fiberglass in a cocaine/fiberglass bonded suitcase, beeswax in a cocaine/beeswax statue, and waste water from an illicit laboratory used to manufacture a controlled substance. If such material cannot readily be separated from the mixture or substance that appropriately is counted in the Drug Quantity Table, the court may use any reasonable method to approximate the weight of the mixture or substance to be counted.

> An upward departure nonetheless may be warranted when the mixture or substance counted in the Drug Quantity Table is combined with other, non-countable material in an unusually sophisticated manner in order to avoid detection. Similarly, in the case of marihuana having a moisture content that renders the marihuana unsuitable for consumption without drying (this might occur, for example, with a bale of rain-soaked mar-

ihuana or freshly harvested marihuana that had not been dried), an approximation of the weight of the marihuana without such excess moisture content is to be used.

U.S.S.G. § 2D1.1, application note 1. The Sentencing Commission expressly made this amendment retroactive. U.S.S.G. § 1B1.10(c). The Sentencing Commission explained that, in promulgating the amendment, it was addressing the "inter-circuit conflict regarding the meaning of the term 'mixture or substance' as used in § 2D1.1 by expressly providing that this term does not include portions of a drug mixture that have to be separated from the controlled substance before the controlled substance can be used." U.S.S.G., App. C, amend. 484; *see also Jackson,* 115 F.3d at 846.

Although the government never asserted such a contention, the court nonetheless recognizes that *Neal* could be read to support the conclusion that this amendment to the Sentencing Guidelines, like the amendment to the Guidelines provisions governing determination of quantity of LSD for Guidelines sentencing purposes, cannot supplant the Supreme Court's interpretation in *Chapman* of the terms "mixture or substance" in the statute defining mandatory minimum sentences. *See Neal,* 516 U.S. at 295–96, 116 S.Ct. 763. However, for further guidance on the question of whether distinctions in the controlled substance, toxicity of the medium, and circumstances of a new definition of "mixture or substance" for Guidelines sentencing purposes make a difference to the determination of Ochoa–Heredia's statutory mandatory minimum sentence, this court turns to interpretations by the Circuit Courts of Appeals of the impact of *Chapman* and *Neal* on mandatory minimum sentences for controlled substances, especially controlled substances other than LSD.

### B. Decisions Of The Circuit Courts Of Appeals

#### 1. Eighth Circuit precedent

This court would be remiss if it did not first consider what, if any, guidance con-

cerning the applicability of the "unusable/unmarketable rule" to mandatory minimum sentence determinations can be drawn from Eighth Circuit precedent. The nearest approach by the Eighth Circuit Court of Appeals to the issue presented here, as Ochoa–Heredia points out, is in *United States v. Dierling*, 131 F.3d 722 (8th Cir.1997), *cert. denied sub nom. Younger v. United States*, 523 U.S. 1054, 118 S.Ct. 1379, 140 L.Ed.2d 525 (1998). In that case,

> Younger argue[d] that the court erred by partially basing his sentence on 300 grams of a substance containing methamphetamine that was found in a jar seized during a stop of his vehicle and on other seized substances containing methamphetamine. Younger contends that these substances were only 0.5% methamphetamine and were therefore undistributable or unmarketable under *United States v. Jennings*, 945 F.2d 129 (6th Cir.1991), *amended on other grounds*, 966 F.2d 184 (6th Cir.1992), *cert. denied*, 519 U.S. 975, 117 S.Ct. 411, 136 L.Ed.2d 324 (1996), and *United States v. Jackson*, 115 F.3d 843 (11th Cir.1997). The methamphetamine in *Jennings* likely contained uningestible, poisonous by–products, and *Jackson* held that only "usable" or "marketable" amounts of controlled substances should be counted for sentencing. 115 F.3d at 846–48.

*Dierling*, 131 F.3d at 737. Thus, the Eighth Circuit Court of Appeals was presented with the question now before this court.

However, the court in *Dierling* found that it was "not necessary to consider whether the marketability test should apply in this circuit." *Id.* at 737 n. 10. This was so, because "[a]ppellants have not presented evidence that the contents of the jar or any of the methamphetamine introduced at trial was tainted or unmarketable." *Id.* at 737. The court noted that the defendant "argued at his sentencing hearing that the jar contained waste water

left over from the manufacture of methamphetamine, [but] he d[id] not make that argument on appeal." *Id.* at 737 n. 9. In the absence of a supporting factual basis for applying what it called "the marketability test," the Eighth Circuit Court of Appeals resolved the weight issue as follows:

> The guidelines specify that the "weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." USSG § 2D1.1(c). (n. *) (Drug Quantity Table). Since 0.5% is a detectable amount, the guidelines require that the drug calculations include the methamphetamine Younger challenges. *See United States v. Smith*, 49 F.3d 362, 367 (8th Cir.) (plain meaning of the guidelines is controlling), *cert. denied*, 514 U.S. 1131, 115 S.Ct. 2009, 131 L.Ed.2d 1008 (1995).

*Dierling*, 131 F.3d at 737. Thus, *Dierling* does not resolve, or even particularly guide, this court's analysis, with the exception that the factual basis for consideration of the question, which was absent in *Dierling*, is present here, because the parties have stipulated that the medium in the bottles in Ochoa–Heredia's case is indeed toxic, and hence the methamphetamine is unmarketable without further processing.

Unfortunately, just as *Dierling* does not provide specific guidance on the question that now confronts this court, no other decisions of the Eighth Circuit Court of Appeals do either. In *United States v. Warren*, 149 F.3d 825 (8th Cir.1998), the court recognized the general principle that *Chapman* controls the interpretation of the weight of drugs for mandatory minimum sentencing purposes, but the issue before the court in *Warren* concerned a typographical error in the statutory provisions determining mandatory minimum sentences for methamphetamine. *See Warren*, 149 F.3d at 827. Similarly, two decisions of the Eighth Circuit Court of Appeals only follow the rule for LSD cases that was later confirmed in *Neal*, *i.e.*, that

a "dual system" for determining quantity in such cases exists, one for mandatory minimum sentencing purposes, and one for Guideline sentencing purposes. *See United States v. Van Thournout*, 100 F.3d 590, 596 (8th Cir.1996) (considering the "ambiguity" on the question of the applicable method of determining weight of LSD for purposes of determining mandatory minimum sentences after *Chapman* and an amendment to U.S.S.G. § 2D1.1, amendment 488, and finding that the issue had been decided for the circuit in *United States v. Stoneking*, 60 F.3d 399, 402 (8th Cir.1995), *cert. denied*, 516 U.S. 1119, 116 S.Ct. 926, 133 L.Ed.2d 855 (1996)).

Because the Eighth Circuit Court of Appeals has not addressed the question now before the court, nor, this court finds, has it addressed similar issues in such a way that this court can draw guidance from its decisions, this court must turn to decisions from other Circuit Courts of Appeals, in which the issue *has* been decided, for guidance.

### 2. Richards and plain meaning

The court will begin its consideration of pertinent decisions of the other Circuit Courts of Appeals with the decision upon which the government specifically relies, the majority opinion in the *en banc* decision of the Tenth Circuit Court of Appeals in *United States v. Richards*, 87 F.3d 1152 (10th Cir.) (*en banc*), *cert. dismissed*, 519 U.S. 1003, 117 S.Ct. 540, 136 L.Ed.2d 396 (1996). This approach seems appropriate, notwithstanding that it lands the court in the middle of the split among the Circuits, chronologically, as well as analytically. First, beginning with the decision in *Richards* seems justified, because that decision effectively lays out the government's position here, particularly in the absence of a brief from the government. Second, the decision in *Richards* also identifies what the Tenth Circuit Court of Appeals took to be the positions of several of the other Circuit Courts of Appeals on this critical issue. Third, the decision in *Richards*

squarely addresses the question of the applicability of the "unusable/unmarketable rule," as embodied in U.S.S.G. § 2D1.1, application note 1, to mandatory minimum sentences under 21 U.S.C. § 841(b). Prior to the amendment to U.S.S.G. § 2D1.1, application note 1, as the discussion to follow will show, courts were not always entirely clear about whether or not they were considering the applicability of the "unusable/unmarketable rule" to determination of mandatory minimum sentences or to Guidelines sentencing ranges.

### a. The majority decision

In *Richards*, Judge Baldock, writing for a majority of the *en banc* court, set out both the issue and its resolution in the first paragraph of his opinion:

> This case requires us to determine whether a combination of liquid by-products and methamphetamine constitute a "mixture or substance containing a detectable amount of methamphetamine" for purposes of sentencing under 21 U.S.C. § 841(b). Applied to the facts, we must decide whether thirty-two kilograms of liquid by-products containing methamphetamine, or twenty-eight grams of pure methamphetamine alone, should be used to calculate Defendant Larry D. Richards' sentence under § 841(b). We conclude that the plain language of § 841(b), and Supreme Court precedent, require us to use the entire thirty-two kilogram weight of the methamphetamine and liquid by-product mixture to calculate Defendant's sentence.

*Richards*, 87 F.3d at 1153.

In *Richards*, the defendant sought to extract pure methamphetamine from thirty-two kilograms of a liquid mixture, used in the process of synthesizing methamphetamine, which contained 28 grams of pure methamphetamine. *Id.* However, "[b]efore he was able to do so, law enforcement officials seized the liquid mixture and arrested Defendant." *Id.* The defendant pleaded guilty to possession of 1000 grams

or more of a liquid mixture containing a detectable amount of methamphetamine with intent to manufacture methamphetamine in powder form. *Id.* In 1990, "[a]pplying U.S.S.G. § 2D.1 [prior to amendment], the court sentenced Defendant based upon the entire thirty-two kilogram liquid mixture to 188 months imprisonment." *Id.; see also United States v. Richards,* 5 F.3d 1369, 1370 (10th Cir.1993) (opinion regarding second or successive petition to vacate sentence pursuant to 28 U.S.C. § 2255, identifying the time of the conviction and sentencing). Thereafter, as noted above, the United States Sentencing Commission amended U.S.S.G. § 2D1.1, effective November 1, 1993, to redefine "mixture or substance" for purposes of the Sentencing Guidelines to exclude "materials that must be separated from the controlled substance before the controlled substance can be used." *Id.* The defendant in *Richards* moved to modify his sentence pursuant to 18 U.S.C. § 3582(c)(2) on the ground that the amended Sentencing Guideline required the district court to reduce his sentence to the mandatory minimum of five years, based on the amount of pure methamphetamine at issue in his case, excluding the weight of liquid by-

products. *Id.* at 1153–54. The government argued that the defendant was still subject to a ten-year mandatory minimum, because the amended commentary to U.S.S.G. § 2D1.1 did not alter the statutory definition of "mixture or substance" in 21 U.S.C. § 841(b) for mandatory minimum sentences. *Id.* at 1154. The district court agreed with the defendant, and a divided appellate panel affirmed. *Id.* The Tenth Circuit Court of Appeals granted *en banc* review "to determine whether the Sentencing Commission's amended construction of 'mixture or substance' authoritatively defines the terms 'mixture or substance' in § 841, or whether the statutory terms retain their plain meaning as construed by the Supreme Court in *Chapman v. United States,* 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991)." *Id.*

The Tenth Circuit Court of Appeals recognized that several Circuit Courts of Appeals had embraced the "marketable" approach asserted by the defendant, under which "the unusable and unmarketable portion of the drug mixtures should be excluded from the calculation of [the defendant's] statutory sentence." *Id.* at 1154–55.[6] The Tenth Circuit Court of Ap-

---

**6.** The Tenth Circuit Court of Appeals characterized the decisions of the other Circuit Courts of Appeals as follows:

The Second, Third, Sixth, Seventh, and Eleventh Circuits have embraced the "marketable" approach. *See, e.g., United States v. Acosta,* 963 F.2d 551, 553–54 (2d Cir. 1992) (in determining defendant's sentence under § 2D1.1, exclude weight of unusable creme liqueur portion in creme liqueur and cocaine mixture); *United States v. Rodriguez,* 975 F.2d 999, 1007 (3d Cir.1992) (in determining a defendant's sentence under § 2D1.1, exclude weight of unusable boric acid portion in boric acid and cocaine mixture); *United States v. Jennings,* 945 F.2d 129, 136–37 (6th Cir.1991) (in determining a defendant's sentence under § 841 and § 2D1.1, exclude weight of uningestible waste water in waste water and methamphetamine mixture); *United States v. Johnson,* 999 F.2d 1192, 1196–97 (7th Cir.1993) (in determining a defendant's sentence under § 2D1.1, exclude weight of unusable waste water in waste water and cocaine base mixture); *United States v. Rolande-*

*Gabriel,* 938 F.2d 1231, 1237–38 (11th Cir. 1991) (in determining a defendant's sentence under § 2D1.1, exclude weight of unusable waste water portion in cocaine and waste water mixture). The Fifth and Ninth Circuits have followed the "marketable" approach in some cases, but adhered to the plain meaning of "mixture or substance" in others, depending upon the controlled substance at issue. *Compare United States v. Sherrod,* 964 F.2d 1501, 1509–10 (5th Cir. 1992) (court should use entire weight of mixture of methamphetamine and waste water to determine defendant's sentence under § 2D1.1), *cert. denied,* 506 U.S. 1041, 113 S.Ct. 832, 121 L.Ed.2d 701 (1992), 507 U.S. 953, 113 S.Ct. 1367, 122 L.Ed.2d 745 (1993) *with United States v. Palacios–Molina,* 7 F.3d 49, 53–54 (5th Cir.1993) (court should exclude the waste water portion of cocaine and waste water mixture to fix a defendant's guidelines' sentence); *and compare United States v. Beltran–Felix,* 934 F.2d 1075, 1076 (9th Cir.1991) (court should use entire weight of methamphetamine and

peals, however, found that it need not interpret for itself the meaning of the terms "mixture or substance" in 21 U.S.C. § 841(b), because "[t]he Supreme Court has authoritatively construed the terms in *Chapman*." *Id.* After reviewing the analysis in *Chapman,* the Tenth Circuit Court of Appeals summarized that decision as follows:

> [T]he Supreme Court ruled that both the plain language of the statute and its legislative history demonstrate that the weight of an entire mixture or substance containing a detectable amount of a controlled substance determines a defendant's eligibility for a mandatory minimum sentence under § 841. *Id.* at 459–63, 111 S.Ct. at 1924–26. The Court did not rule, however, that only a usable, marketable, or consumable mixture constitutes a "mixture or substance" under § 841. In the Court's words, "[s]o long as it contains a detectable amount, the entire mixture or substance is to be weighed when calculating the sentence." *Id.* at 459, 111 S.Ct. at 1924.

*Richards,* 87 F.3d at 1156. Moreover, the court in *Richards* concluded that, in *Neal,* the Supreme Court had "reaffirmed that *Chapman* sets forth the governing definition of 'mixture or substance' for purposes of § 841," by holding "that *Chapman*'s plain meaning interpretation of 'mixture or substance' governs the determination of a defendant's statutory mandatory minimum sentence under § 841, even where the Sentencing Commission adopts a conflicting definition in the sentencing guidelines." *Id.* at 1156–57 (citing *Neal,* 516 U.S. at 294–96, 116 S.Ct. 763). The Tenth Circuit Court of Appeals therefore concluded that "*Chapman*'s plain-meaning interpretation of 'mixture or substance' in § 841 governs our resolution in this case":

> Although the Court in *Chapman* specifically interpreted "mixture or substance"

in 21 U.S.C. § 841(b)(1)(B)(v), its interpretation is not limited to that subsection. Under settled canons of statutory construction, we presume that identical terms in the same statute have the same meaning. *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 479, 112 S.Ct. 2589, 2596, 120 L.Ed.2d 379 (1992); *Boise Cascade Corp. v. United States EPA,* 942 F.2d 1427, 1432 (9th Cir.1991). Accordingly, the plain meaning of "mixture or substance" governs Defendant's mandatory minimum sentence calculation under § 841(b). *Chapman,* 500 U.S. at 461–62, 111 S.Ct. at 1925–26; *Neal,* 516 U.S. at 292–93, 116 S.Ct. at 768–69.

Applying the plain meaning of "mixture," the methamphetamine and liquid by-products Defendant possessed constitute "two substances blended together so that the particles of one are diffused among the particles of the other." *Chapman,* 500 U.S. at 462, 111 S.Ct. at 1926 (citing 9 Oxford English Dictionary 921 (2d ed.1989)). Liquid by-products containing methamphetamine therefore constitute a "mixture or substance containing a detectable amount of methamphetamine" for purposes of § 841(b). Defendant possessed a thirty-two kilogram mixture of methamphetamine and liquid by-products. Thus, Defendant possessed "1 kilogram or more of a mixture or substance containing a detectable amount of methamphetamine." 21 U.S.C. § 841(b)(1)(A)(viii). Under § 841, Defendant is subject to a mandatory minimum ten-year term of imprisonment. *Id.*

*Richards,* 87 F.3d at 1157.

The majority in *Richards* rejected the "Defendant's invitation to define the statute in accord with the Sentencing Commission's amendment under a 'congruent'

---

waste water mixture to calculate defendant's sentence under § 841), *cert. denied,* 502 U.S. 1065, 112 S.Ct. 955, 117 L.Ed.2d 123 (1992) *with United States v. Robins,* 967 F.2d 1387, 1389 (9th Cir.1992) (court

should exclude the unusable cornmeal portion of a cocaine and cornmeal mixture in determining defendant's sentence under § 2D1.1).
*Richards,* 87 F.3d at 1155 n. 2.

approach," because the Sentencing Commission's amendment of U.S.S.G. § 2D1.1 for purposes of determining Guidelines sentencing range could not override the Supreme Court's interpretation of the statute establishing mandatory minimum sentences. *Id.* The majority also rejected the "marketable" approach adopted by several other Circuit Courts of Appeals:

Defendant relies on authority from the Second, Third, Sixth, Seventh, and Eleventh Circuits ruling that only usable or marketable portions of drug mixtures constitute "mixtures" for purposes of sentencing under § 841. *Acosta,* 963 F.2d at 553–54; *Rodriguez,* 975 F.2d at 1007; *Jennings,* 945 F.2d at 136–37; *Johnson,* 999 F.2d at 1196–97; *Rolande–Gabriel,* 938 F.2d at 1237–38. As we explained in *United States v. Killion,* 7 F.3d 927 (10th Cir.1993), *cert. denied,* 510 U.S. 1133, 114 S.Ct. 1106, 127 L.Ed.2d 418 (1994), "[t]hese courts reason that it is logical to include the weight of materials that are marketable or facilitate the marketability of the drug in question, and to exclude the weight of materials that do not." *Id.* at 932. The Second Circuit observed, "[v]iewed through a market-oriented prism, there is no difference in culpability between individuals bringing the identical amount and purity of drugs to market but concealing the drugs in different amounts of unusable mixtures." *Acosta,* 963 F.2d at 554.

In essence, Defendant contends that it is fairest to sentence based only on the marketable or usable portions of drug mixtures defendants bring to the marketplace. Congress, however, did not adopt this approach. One searches in vain to find the words "marketable," "usable," or "consumable" in the plain language of § 841 or its legislative history. Congress did not enact these concepts into the statutory scheme. Instead, Congress recognized the reality of the illicit drug market when it stated that a defendant is eligible for a mandatory minimum sentence if the defendant commits a drug offense involving a "mixture or substance containing a detectable amount of" a controlled substance. In no way did Congress limit § 841 to usable or marketable mixtures containing controlled substances. "Detectable amount," and not usable, marketable, or consumable, is therefore the hallmark of an § 841 "mixture or substance." *See Chapman,* 500 U.S. at 459, 111 S.Ct. at 1924 ("So long as it contains a detectable amount, the entire mixture or substance is to be weighed when calculating the sentence."). Hence, as long as the defendant possesses the specified quantity of a "mixture or substance containing a detectable amount of" a controlled substance, Congress requires a mandatory minimum sentence. Such a broad sentencing scheme may result in sentencing disparities. Policy decisions, however, vest in the legislative branch, not the judicial: "Congress, not this Court, has the responsibility for revising its statutes." *Neal,* 516 U.S. at 295, 116 S.Ct. at 769. Accordingly, we reject Defendant's version of the "marketable" approach.

*Richards,* 87 F.3d at 1157–58. Thus, the majority in *Richards* held that the defendant was subject to a mandatory minimum sentence based upon the entire 32 kilograms of liquid by-product in which a detectable amount of methamphetamine was found. *Id.* at 1158.

The government urges this court to adopt the view of the majority in *Richards* and determine the weight of methamphetamine involved in this case, for purposes of determining Ochoa–Heredia's mandatory minimum sentence, based on the weight of the entirety of the "mixture or substance" in which the methamphetamine was found, that is, by including the weight of the unknown medium, which results in a drug quantity of over 3,000 grams of a mixture or substance containing only 26.2 grams of detectable methamphetamine. However, the reasoning of the dissenters from the

majority decision in *Richards* is also entitled to due consideration.

### b. The dissenting opinions

Two judges joined Chief Judge Seymour in her dissenting opinion in *Richards. See Richards,* 87 F.3d at 1158 (Seymour, C.J., dissenting, joined by Porfilio, J., and Henry, J.). Like the majority, Judge Seymour wasted no time in laying out the dissenters' position:

> The majority bases its construction of 21 U.S.C. § 841(b) upon its determination that the Supreme Court's ruling in *Chapman v. United States,* 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), governs this case. I agree with that premise, but not with the majority's reading of *Chapman.* The majority has divorced the holding in *Chapman* from its underlying circumstances and rationale, and has applied the holding to produce a result which in this case is directly at odds with that rationale. Because I agree with the majority of my sister circuits addressing the issue that Congress intended its reference to "mixture or substance" in section 841(b) to refer to a marketable or usable mixture, I dissent.

*Richards,* 87 F.3d at 1158.

The dissenters reasoned that, in construing statutes, the court was required to " 'effectuate the intent reflected in the language of the enactment and the legislative process,'" *id.* (quoting *Colorado v. Idarado Mining Co.,* 916 F.2d 1486, 1494 (10th Cir.1990)), but it was "not required to 'produce a result demonstrably at odds with the intentions of [a statute's] drafters.'" *Id.* (quoting *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)) (other internal quotation marks omitted). For that reason, the dissenters noted that "[t]he Court in *Chapman* looked for Congress' intent in both the language of 21 U.S.C. § 841 and in its legislative history." *Id.* at 1159 (citing *Chapman,* 500 U.S. at 460–61, 111 S.Ct. 1919). Specifically,

The Court found that "Congress adopted a 'market-oriented' approach to punishing drug trafficking, under which the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence." *Id.* at 461, 111 S.Ct. at 1925 (emphasis added). The Court said:

> By measuring the quantity of the drugs according to the "street weight" of the drugs in the diluted form in which they are sold, rather than according to the net weight of the active component, the statute ... increase[s] the penalty for persons who possess large quantities of drugs, regardless of their purity. That is a rational sentencing scheme.

> This is as true with respect to LSD as it is with respect to other drugs. Although LSD is not sold by weight, but by dose, and a carrier medium is not, strictly speaking, used to "dilute" the drug, that medium is used to facilitate the distribution of the drug. Blotter paper makes LSD easier to transport, store, conceal, and sell. It is a tool of the trade for those who traffic in the drug, and therefore it was rational for Congress to set penalties based on this chosen tool. *Id.* at 465–66, 111 S.Ct. at 1927–28 (emphasis added). Accordingly, the Court held that "the statute requires the weight of the carrier medium to be included when determining the appropriate sentence for trafficking in LSD." *Id.* at 468, 111 S.Ct. at 1929.

In my judgment, *Chapman*'s recognition of Congress' "market-oriented" approach dictates that we not treat unusable drug mixtures as if they were usable. Here, as the majority points out, defendant pled guilty under 21 U.S.C. § 841(a), (b)(1)(A)(viii) to possession of 1000 grams or more of a liquid mixture containing a detectable amount of methamphetamine with intent to manufacture methamphetamine in powder form. Defendant was not intending to market the

waste water, which would have been discarded in the manufacturing process. The waste water was neither a carrier medium for the distribution of methamphetamine nor a cutting agent.

*Richards,* 87 F.3d at 1159 (Seymour, C.J., dissenting).

In reaching this conclusion, the dissenters noted that "[f]ive circuits have distinguished between usable and unusable drug mixtures in interpreting 'mixture' for purposes of section 841 and U.S.S.G. § 2D1.1." *Id.* at 1159–60.[7] The dissenters also noted that "[t]his usable/unusable distinction has been applied by two circuits in the context of methamphetamine in waste water, and by two circuits in the context of cocaine waste water." *Id.* at 1160 (internal citations omitted).[8] Moreover, the dissenters reasoned, "[t]his interpretation of 'mixture or substance' for statutory purposes also would permit us to refer to the guideline definition and 'adopt a congruent interpretation of the statutory term as an original matter.'" *Id.*

(quoting *United States v. Palacio,* 4 F.3d 150, 154 (2d Cir.1993)). The dissenters relied on the purpose and authority of the Sentencing Commission as supporting application of the Commission's interpretation to the statutory provision, and noted further that the Sentencing Commission had specifically and unambiguously excluded the weight of waste water from the measurement of a "mixture or substance" in the amended version of U.S.S.G. § 2D1.1, application note 1. *Id.* While adopting an interpretation contrary to the Sentencing Commission's for purposes of determining mandatory minimum sentences will "lead to unnecessary conflict and confusion," the dissenters concluded that "harmonizing" the interpretations would be more appropriate. *Id.* "Furthermore, because the statutory mandatory minimum automatically becomes the guideline sentence when it is greater than the maximum of the applicable guideline range, *see* U.S.S.G. § 5G1.1(b), allowing waste water to comprise a 'mixture or substance' under the statute will effective-

7.  The dissenters cited the following decisions in this regard:

    > *See United States v. Acosta,* 963 F.2d 551, 554 (2d Cir.1992) ("[E]ven though the cocaine/creme liqueur may fall within the dictionary definition of 'mixture,' the legislative history convinces us that the weight of the creme liqueur must be excluded."); *United States v. Rodriguez,* 975 F.2d 999, 1007 (3d Cir.1992) ("We find that the usable/unusable differentiation adopted by the Second, Sixth, Ninth, and Eleventh Circuits, rather than the First Circuit approach, best follows the reasoning in Chapman."); *United States v. Jennings,* 945 F.2d 129, 136 (6th Cir.1991) ("[I]nterpreting the statute to require inclusion of the entire [mixture] for sentencing in this case would both produce an illogical result and be contrary to the legislative intent underlying the statute."); *United States v. Johnson,* 999 F.2d 1192, 1196 (7th Cir.1993) ("To read the statute or *Chapman* as requiring inclusion of the weight of all mixtures, whether or not they are usable, ingestible, or marketable, leads to absurd and irrational results contrary to congressional intent."); *United States v. Rolande-Gabriel,* 938 F.2d 1231, 1236 (11th Cir.1991) ("The Court in *Chapman* found that a plain meaning inter-

    > pretation of 'mixture' does not create an irrational result in the context of LSD and standard carrier mediums; however, in the present case it would be irrational for the court to fail to distinguish between usable and unusable drug mixtures...."). *See also United States v. Palacios–Molina,* 7 F.3d 49, 53–54 (5th Cir.1993) (holding waste liquids in which cocaine was transported not a "mixture," and distinguishing prior Fifth Circuit authority). *But see United States v. Mahecha–Onofre,* 936 F.2d 623, 625–26 (1st Cir.), *cert. denied,* 502 U.S. 1009, 112 S.Ct. 648, 116 L.Ed.2d 665 (1991); *United States v. Sherrod,* 964 F.2d 1501, 1509–10 (5th Cir.1992); *United States v. Beltran–Felix,* 934 F.2d 1075, 1076 (9th Cir.1991).

    *Richards,* 87 F.3d at 1159–60 (Seymour, C.J., dissenting).

8.  The dissenters cited *Jennings,* 945 F.2d at 129, and *United States v. Newsome,* 998 F.2d 1571 (11th Cir.1993), as two circuit decisions involving methamphetamine in waste water to which the courts had applied the "usable/unusable distinction," and *Johnson,* 999 F.2d at 1192, and *Palacios–Molina,* 7 F.3d at 49, as circuit decisions applying this distinction to cocaine waste water. *See Richards,* 87 F.3d at 1160 (Seymour, C.J., dissenting).

ly nullify the Commission's policy choice." *Id.* at 1160–61. "In light of this persuasive authority, [the dissenters] would hold that section 841 does not include the weight of waste by-products in the measurement of a 'mixture or substance.'" *Id.* at 1161.

Nor did the dissenters find that *Chapman* was to the contrary, finding a critical difference between a "carrier medium" for LSD and methamphetamine waste water:

> In deciding to the contrary, the majority relies upon the result in *Chapman* while rejecting *Chapman*'s conclusion that this result was the necessary product of Congress' decision to adopt "a 'market-oriented' approach to punishing drug trafficking." *Chapman,* 500 U.S. at 461, 111 S.Ct. at 1925. The majority disregards the Supreme Court's holding that the market approach drove Congress' drug sentencing scheme and makes it rationally based. *See id.* at 465–66, 111 S.Ct. at 1927–28. When section 841(b) is examined in light of this approach, it is clear that including a usable LSD carrier medium in the definition of "mixture or substance" furthers that approach, while including methamphetamine waste water does not. Accordingly, I respectfully dissent.

*Richards,* 87 F.3d at 1161 (Seymour, C.J., dissenting).

Judge Porfilio, who joined in Chief Judge Seymour's dissent, added his own separate dissent consisting of the following:

> I join the dissent of Chief Judge Seymour in all respects. Because I believe the majority has effectively reduced the precept of following the plain language of legislation to a mere shibolith, I write only to remind the court of the wise admonition of Learned Hand that "one of the surest indexes of a mature judiciary [is] not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide

to their meaning." *Cabell v. Markham,* 148 F.2d 737, 739 (2nd Cir.), *aff'd.* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

*Richards,* 87 F.3d at 1161 (Porfilio, J., dissenting).

### 3. Other circuits and the "unusable/unmarketable rule"

As both the majority and the dissenters in *Richards* acknowledge, all but one of the other Circuit Courts of Appeals to address the question have adopted a rule that, at least for some sentencing purposes, excludes an unusable or unmarketable medium from the determination of the weight of a controlled substance. However, as this court remarked above, the context in which the courts have adopted the rule—whether for purposes of determining mandatory minimum sentences or sentencing ranges under the Guidelines—has not always been clear. *See, e.g., United States v. Jackson,* 115 F.3d 843, (11th Cir.1997) (asserting that "[t]he marketable or "usable" approach has been adopted by the Second, Third, Fifth, Sixth, Seventh and Ninth Circuits, and rejected by the First and Tenth Circuits," but not clearly delineating whether the rule was applied to both mandatory minimum sentences and Guidelines sentencing ranges, or only to the latter) (footnote citations omitted). This court finds that, to develop a true understanding of the positions and reasoning of the Circuit Courts of Appeals, it is necessary to determine the precise context in which courts have adopted or rejected application of the "unusable/unmarketable rule."

### a. The Tenth Circuit Court of Appeals after Richards

Not surprisingly, shortly after the *en banc* decision in *Richards,* a panel of the Tenth Circuit Court of Appeals cited *Richards* for the proposition that "it does not matter whether the substance is usable or marketable," in holding that a defendant was not prejudiced by his counsel's stipu-

lation as to the weight of marijuana involved in his offense, including stalks and moisture, a stipulation that apparently controlled both his mandatory minimum sentence and sentencing range under the Sentencing Guidelines. *See United States v. Moreno,* 94 F.3d 1453, 1456 (10th Cir. 1996). The court in *Moreno* cited decisions of the Seventh and Eighth Circuit Courts of Appeals as recognizing that " 'stalks of the marijuana plant, although excluded from the guideline definition of marijuana, can still constitute part of a "mixture or substance" containing a detectable amount of marijuana for the calculation of weight of the controlled substance seized.' " *Id.* (quoting *United States v. Garcia,* 925 F.2d 170, 173 (7th Cir.1991), in turn citing *United States v. Berry,* 876 F.2d 55, 56 (8th Cir.1989)). Thus, despite its minority position, the Tenth Circuit Court of Appeals apparently has adhered to its rejection of the "usability" or "marketability" test in *Richards* for purposes of determining mandatory minimum sentences.

### b. The First Circuit Court of Appeals

The only other Circuit Court of Appeals to reject application of the "unusable/unmarketable rule" to determination of mandatory minimum sentences is the First Circuit Court of Appeals. In *United States v. Mahecha–Onofre,* 936 F.2d 623 (1st Cir.), *cert. denied,* 502 U.S. 1009, 112 S.Ct. 648, 116 L.Ed.2d 665 (1991)—a decision rendered before *Richards* and before the amendment to U.S.S.G. § 2D1.1, which figured prominently in the arguments of the unsuccessful defendant in *Richards* — the First Circuit Court of Appeals affirmed the district court's inclusion of the weight of acrylic suitcases, in which the cocaine at issue was bonded, minus all metal parts, in its calculation of the weight of cocaine for *both* mandatory minimum and Guidelines sentencing purposes. *Mahecha–Onofre,* 936 F.2d at 625. Although the defendant contended that the "suitcase/cocaine" chemically bonded material was not a "mixture or substance" with-

in the meaning of either the sentencing statute or the Guidelines, the First Circuit Court of Appeals rejected that argument on the basis of *Chapman.* *Id.* (citing *Chapman* as involving a "virtually identical argument"). The First Circuit Court of Appeals explained:

> The Supreme Court's reasoning applies to the present case with one exception. Unlike blotter paper or cutting agents, the suitcase material obviously cannot be consumed; and the cocaine must be separated from the suitcase material before use. We do not believe, however, that this fact alone can make a difference to the outcome, for "ingestion" would not seem to play a critical role in the definition of "mixture" or "substance." Indeed, one reason why Congress and the Sentencing Commission have specified that courts not consider drug "purity" in imposing sentence is that "weight" and "purity" both, roughly speaking, correlate with the seriousness of the crime. That is to say, a defendant who has more of the drug is also likely to have purer drug (not in every case, but, very roughly speaking, in many cases). Hence, Congress determined that the effort to determine purity is not worth the extra precision (in terms of correlating punishment with crime seriousness) that doing so might produce. Insofar as Congress engaged in this kind of reasoning, it is worthwhile pointing out that the effort required to create a chemically-bonded cocaine/acrylic suitcase suggests a serious drug smuggling effort of a sort that might warrant increased punishment. Regardless, the suitcase/cocaine "mixture" or "substance" fits the statutory and Guideline definitions as the Supreme Court has recently interpreted them in *Chapman.*

*Mahecha–Onofre,* 936 F.2d at 626. It is worth noting that, in holding forth on the reasoning of Congress, the court in *Mahecha–Onofre* cited no part of the Congres-

sional Record, nor any other evidence of legislative intent.

It is also worth noting that the Sentencing Guidelines now specifically exclude the calculation of drug quantity employed in *Mahecha–Onofre* for purposes of determining the Guidelines sentencing range. *See* U.S.S.G. § 2D1.1, application note 1 (*supra* at p. 17). Moreover, the First Circuit Court of Appeals has also recognized the applicability of the "unusable/unmarketable rule" to determinations of Guidelines sentencing ranges after the amendment to application note 1 of U.S.S.G. § 2D1.1. *See United States v. Campbell,* 61 F.3d 976, 982–83 (1st Cir.1995) (noting that "[t]he commentary excludes only materials that are unusable or unmarketable, such as those used to transport the controlled substance, ... or waste products of the drug manufacturing process that are discarded before the controlled substance is put into the distribution chain," and therefore including non-P2P materials that did not need to be separated from the P2P before use in the determination of weight of P2P for Guidelines sentencing purposes) (internal citations omitted), *cert. denied,* 517 U.S. 1161, 116 S.Ct. 1556, 134 L.Ed.2d 657 (1996).[9] Nevertheless, the First Circuit Court of Appeals also stands as a circuit in which the "unusable/unmarketable rule" does *not* apply to determinations of quantity for mandatory minimum sentences.

### c. *Courts adopting the "unusable/unmarketable rule"*

Several courts—indeed, the majority of the Circuit Courts of Appeals—have ex-pressly adopted the "unusable/unmarketable rule," although, as this court has suggested, these courts have not always made it clear whether the rule applies to both determination of statutory mandatory minimum sentences and Guideline sentencing ranges. Also, as the discussion to follow will show, the adoption of the rule has sometimes been severely restricted. This court will attempt to determine in which context or contexts these decisions have applied the rule, so that the court can determine to what extent these decisions support adoption of the rule to determine Ochoa–Heredia's statutory mandatory minimum sentence for possession of methamphetamine with intent to distribute it. In other words, the court will attempt to determine which decisions properly suggest a reading of the terms of the statute defining mandatory minimum sentences and *Chapman* that permits application of the rule, and which are merely consistent with what is now the rule for Guidelines sentencing ranges pursuant to application note 1 of U.S.S.G. § 2D1.1.

### i. *Pre-amendment applications of the rule.*

This court finds that applications of the "unusable/unmarketable rule" *before* the amendment to application note 1 to U.S.S.G. § 2D1.1 are persuasive, whether the cases specifically involved mandatory minimum sentences or only sentencing ranges under the Sentencing Guidelines. This is so, because all such cases considered the phrase to have the same meaning—that is, the meaning ascribed to the phrase in *Chapman*—in both the Sentencing Guidelines and the statute. It is in

9. Although, in *Campbell,* the First Circuit Court of Appeals cites *Mahecha–Onofre* as an example of the exclusion of "materials that are unusable or unmarketable, such as those used to transport the controlled substance," no amount of imagination this court has been able to bring to bear on *Mahecha–Onofre* can make that decision anything but *contrary* to the amended Guideline. This court cannot read *Mahecha–Onofre* to stand for the proposition that unusable or unmarketable materials should be excluded from calculation of drug quantities for Sentencing Guidelines purposes, prior to the amendment of U.S.S.G. § 2D1.1, application note 1, because *Mahecha–Onofre* specifically held that the fact that the suitcase/cocaine material could not be consumed, and that the cocaine had to be separated from the suitcase material before use, could not alone make a difference to its conclusion that the weight of the entirety of the suitcase/cocaine material should be included for purposes of determining both mandatory minimum sentence and Guideline sentencing range. *See Mahecha–Onofre,* 936 F.2d at 626.

this context, for example, that the Tenth Circuit Court of Appeals rejected application of the rule to determination of either mandatory minimum sentences or Guidelines sentencing range in *Mahecha–Onofre,* 936 F.2d at 625–26.

Other courts, however, reached conclusions different from that of the Tenth Circuit Court of Appeals in *Mahecha–Onofre,* but not necessarily on first consideration. The Ninth Circuit Court of Appeals initially rejected application of the "unusable/unmarketable rule" to determination of a mandatory minimum sentence for possession of methamphetamine with intent to distribute it in *United States v. Beltran–Felix,* 934 F.2d · 1075 (9th Cir.1991), *cert. denied,* 502 U.S. 1065, 112 S.Ct. 955, 117 L.Ed.2d 123 (1992). In *Beltran–Felix,* the defendant contended that he did not fall into the five-year mandatory minimum sentencing range under 21 U.S.C. § 841(b)(1)(B)(viii), because "the 192 gram solution of methamphetamine that was the subject of his guilty plea 'was not in a distributable state.'" *Beltran–Felix,* 934 F.2d at 1076. The court rejected this contention, as follows:

> Defendant claims that because the 192 grams of liquid solution was not yet readily marketable, it should not have been used by the district court to find that he possessed more than 100 grams of a mixture containing methamphetamine.
>
> Defendant's argument directly contradicts the terms of section 841(b)(1)(B)(viii), which says the mandatory minimum applies to offenses involving "100 grams ... of a mixture ... containing a detectable amount of methamphetamine...." Since the statute conspicuously does not say 100 grams of a "marketable mixture," it would appear to encompass any mixture. Defendant, with his 192 gram amphetamine solution, falls within the statute's terms. And we do not find any language in the legislative history that requires us to read the phrase "a mixture or substance" to

mean "a [readily marketable] mixture or substance."

*Beltran–Felix,* 934 F.2d at 1076.

The Ninth Circuit Court of Appeals, however, later took a somewhat different view in *United States v. Robins,* 967 F.2d 1387 (9th Cir.1992). In *Robins,* the defendants used 2,779 grams of cornmeal, hidden by duct tape, in two packages containing one-tenth of a gram of cocaine, visible to buyers, to attempt to convince buyers that both packages contained substantial quantities of cocaine. *Robins,* 967 F.2d at 1388. The court concluded that the cornmeal was easily distinguishable from the cocaine; unlike the blotter paper in *Chapman,* the cornmeal was not a "tool of the trade"; the cornmeal was not a carrier medium or cutting agent; and the cornmeal did not facilitate the distribution of the cocaine. *Id.* at 1389. Furthermore, the cornmeal had to be separated from the cocaine before the cocaine could be effectively used. *Id.* The court concluded that the cornmeal was a "functional equivalent of packaging material, which the Court in *Chapman* recognized was not to be included in the weight calculation." *Id.*

The court in *Robins* distinguished its prior decision in *Beltran–Felix* on the ground that the solution in that case facilitated the distribution of the methamphetamine and the methamphetamine could not have been produced without it. *Id.* at 1390. Although the cornmeal in *Robins* was "consumable," the cornmeal was not used to dilute the cocaine to increase the amount available to sell to consumers, but was intended to be passed off as cocaine, and so, the cornmeal did not constitute "'a drug product moving through the chain of distribution in the manner envisioned by Congress.'" *Id.* (quoting *United States v. Chan Yu–Chong,* 920 F.2d 594, 597 (9th Cir.1990)). Because the cornmeal was used to trick a purchaser into buying cornmeal, thinking it was cocaine, the court concluded that the weight of the cornmeal should not have been included in the calcu-

lation of the defendant's sentence. *Id.* at 1391.

Just a few months after the decision in *Beltran–Felix*, the Eleventh Circuit Court of Appeals specifically embraced the "unusable/unmarketable rule" in *United States v. Rolande–Gabriel*, 938 F.2d 1231 (11th Cir.1991). Although *Rolande–Gabriel* involved only a Guideline sentencing range issue, as this court suggested more generally above, it is nevertheless persuasive on the applicability of the rule to mandatory minimum sentences. In *Rolande–Gabriel*, neither the quantity of pure cocaine nor the quantity of the cocaine and "liquid waste" at issue pushed the defendant into a quantity range subject to a mandatory minimum sentence. *See Rolande–Gabriel*, 938 F.2d at 1232–33 (the bags weighed 241.6 grams, including "liquid waste," 7.2 grams of cocaine base, and 65 grams of "a cutting agent," but the sentence imposed, based on the gross weight of the contents of the bags, was 21 months for importation of cocaine in violation of 21 U.S.C. §§ 952(a)(1) and 960(a)(1)). Nevertheless, the decision in *Rolande–Gabriel* involved the interpretation of "mixture or substance" for purposes of applying U.S.S.G. § 2D1.1 (prior to the 1993 amendment to application note 1), which the court in *Rolande–Gabriel* specifically found required those terms to be given the "same meaning as in 21 U.S.C. § 841." *Id.* at 1233 (citing U.S.S.G. § 2D1.1 at cmt. 2.48).

In *Rolande–Gabriel*, the defendant's "argument [was] premised on the contention that the inclusion of the weight of the liquid would be contrary to the sentencing guidelines' stated purpose of sentencing uniformity," because inclusion of unusable carrier mediums would result in "widely divergent sentences." *Id.* The court distinguished prior decisions, which the court found involved the inclusion of the entire weight of a *usable* mixture, from the case then before it, which involved an "unusable mixture, *i.e.,* unusable or unmarketable to the consumer, at the time of arrest." *Id.*

at 1234. On what it found to be a question of first impression in the Eleventh Circuit, the court first examined the purposes of the Sentencing Guidelines, including development of a "coherent system of rational and uniform sentencing." *Id.* at 1234–35. However, the court noted that this goal must be balanced against a comment to U.S.S.G. § 2D1.1 providing that the terms "mixture or substance" have the same meaning as it does in 21 U.S.C. § 841, "which does not differentiate between various types of mixtures." *Id.* at 1234–35.

The court framed the resulting conflict and its resolution as follows:

The Sentencing Guidelines Statutory Mission and Policy Statement clearly and plainly indicate that the primary purpose of the guidelines system is to create a scheme of "uniform and rational" sentencing. In applying the term "mixture" to the facts of this case, we are faced with a conflict between the commission's comment indicating that the term "mixture" means the same as it does in 21 U.S.C. § 841, and the Sentencing Guidelines' well-documented purpose of rationality and uniformity in sentencing. If we strictly adhere to the committee's comment, then all mixtures are to be included, despite the fact that disparate and irrational sentences will result. If we read "mixture" in conjunction with the purposes behind the Sentencing Guidelines, then section 2D1.1 should be applied in a manner which creates the greatest degree of uniformity and rationality in sentencing. *See Baxstrom v. Herold*, 383 U.S. 107, 111, 86 S.Ct. 760, 763, 15 L.Ed.2d 620 (1966) (legislative classifications should have some relevance to the purpose for which they are made). Faced with a choice between contradictory statements of intent and policy by the Guidelines Commission, we adopt the more rational alternative.

The inclusion of the weight of unusable mixtures in the determination of sentences under section 2D1.1 leads to

widely divergent sentences for conduct of relatively equal severity. In the present case, the appellant was sentenced based on a total weight of 241.6 grams, despite the fact that only 72 grams of the mixture constituted a usable or consumable drug mixture. This hyper-technical and mechanical application of the statutory language defeats the very purpose behind the Sentencing Guidelines and creates an absurdity in their application: the disparate and irrational sentencing arising out of a "rational and uniform" scheme of sentencing.

*Rolande–Gabriel,* 938 F.2d at 1235.

Perhaps of even greater importance here is the court's discussion of the impact of interpretation of "mixture or substance" in *Chapman:*

> Despite this obvious lack of rationality, we would be obliged to affirm Rolande–Gabriel's sentence if the Supreme Court's decision in *Chapman v. United States,* 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), is dispositive of the issues presented in this case. We are not required, however, to affirm the sentencing decision of the district court because of the significant distinguishing factors between the present case and *Chapman.*

*Rolande–Gabriel,* 938 F.2d at 1235–36. The first such distinguishing factor, the court found, was that "[t]he Court in *Chapman* found that a plain meaning of 'mixture' does not create an irrational result in the context of LSD and standard carrier mediums; however, in the present case it would be irrational for the court to fail to distinguish between usable and unusable drug mixtures in apply Sentencing Guideline § 2D1.1." *Id.* at 1236. More specifically, the court reasoned as follows:

> In *Chapman,* the LSD and other drugs in carrier mediums considered by the Court were usable, consumable, and ready for wholesale or retail distribution when placed on standard carrier mediums, such as blotter paper, gel, and sugar cubes. The Supreme Court notes

this key fact in its decision, stating that "the LSD cannot be distinguished from the blotter paper, nor easily separated from it. Like cutting agents used with other drugs that are ingested, the blotter paper, gel, or sugar cube carrying LSD can be and often is ingested with the drug." *Id.* at 1926.

While LSD is ready for sale, use, or consumption when it is placed on standard carrier mediums such as blotter paper, gel, or sugar cubes, the cocaine mixture in this case was obviously unusable while mixed with the liquid waste material. Prior to subjecting the contents of Rolande–Gabriel's bags to a chemical extraction process, the cocaine mixture was not ready for retail at the street-level or for wholesale by the big-time drug kingpin. The Court stated the inclusion of the weight of standard carrier mediums is rational because standard carrier mediums facilitate the use, marketing and access of LSD and other drugs. *Chapman,* 111 S.Ct. at 1927. The liquid waste in this case, however, did not accomplish any of these purposes. The inclusion of the carrier medium of unusable liquid waste in this case for sentencing is irrational.

The liquid found in Rolande–Gabriel's bags is similar to the "packaging" materials referred to by the Supreme Court in *Chapman. Id.* at 1926. The cocaine mixture in the present case was "easily distinguished from, and separated from" its liquid waste carrier medium. The government chemist easily distinguished the liquid from the drug powder and its cutting agent, characterizing it as "non-drug waste." Following extraction of the "waste" material, the chemist threw the liquid away.

The distinction we recognize is consistent with the Supreme Court's analysis in *Chapman.* The entire weight of drug mixtures which are usable in the chain of distribution should be considered in determining a defendant's sentence. This case does not conflict with that

proposition because Rolande–Gabriel's sentence will be based on the gross weight of the usable drug mixture in this case.

*Rolande–Gabriel,* 938 F.2d at 1237.

In addition to these reasons, the court in *Rolande–Gabriel* also noted that the rule of lenity, rejected in *Chapman,* was properly applied in the case before it to avoid an "absurd and glaringly unjust result," and that the Supreme Court itself had recognized in *Chapman* that "different situations may lead to different interpretations," when the Court stated that " 'hypothetical cases can be imagined involving heavy carriers and very little [drug], [but] those cases are of no import in considering a claim by persons such as petitioners, who used a standard [drug] carrier.' " *Id.* at 1237–38 (citing *Chapman,* 500 U.S. at 466). The court in *Rolande–Gabriel* concluded,

> The present case presents a hypothesis which has become reality. There are real facts present in this case that are dramatically different from *Chapman* which this court cannot overlook. Not only is this case distinguishable on the facts, we hold that the rule of lenity should be applied to the statute to avoid absurdity and irrationality in the application of the Sentencing Guidelines. We therefore hold that the term "mixture" in U.S.S.G. § 2D1.1 does not include unusable mixtures. This distinction is logical and rational, given the aforementioned differences between mixtures which are usable and ones which are unusable.

*Rolande–Gabriel,* 938 F.2d at 1238.

Thus, although the court in *Rolande–Gabriel* actually applied the "unusable/unmarketable rule" only to a Guidelines sentencing range determination of drug quantity, it did so on grounds that it considered equally applicable to a determination of a statutory mandatory minimum sentence. Indeed, the court arrived at its interpretation of the language in the Sentencing Guideline only by interpreting the *statutory* language in light of *Chapman,* and then applying that interpretation to the identical language in the Sentencing Guideline.

Somewhat later, in *United States v. Newsome,* 998 F.2d 1571 (11th Cir.1993), *cert. denied,* 510 U.S. 1062, 114 S.Ct. 734, 126 L.Ed.2d 698 (1994), the Eleventh Circuit Court of Appeals distinguished its prior decision in *Rolande–Gabriel* to hold that methamphetamine oil, a precursor chemical in the manufacture of methamphetamine, is includible in the weight of drugs for sentencing purposes, on the ground that the methamphetamine oil was part of a conspiracy to manufacture methamphetamine. *Newsome,* 998 F.2d at 1576–78. However, the court reiterated its position in *Rolande–Gabriel* as to unusable and toxic "sludge" from the manufacturing process, excluding those by-products from the weight of methamphetamine for *all* sentencing purposes. *Id.* at 1578–79. Thus, the only situation in which the Eleventh Circuit Court of Appeals did not apply the "unusable/unmarketable rule" was the situation in which the as yet unusable material was a *precursor* chemical in drug manufacturing and the defendant was charged with conspiracy to manufacture the drug.

For reasons similar to those presented in *Rolande–Gabriel,* the Sixth Circuit Court of Appeals adopted the "unusable/unmarketable rule" for purposes of determining a mandatory minimum sentence when methamphetamine was seized in a poisonous "cooking" mixture in *United States v. Jennings,* 945 F.2d 129 (6th Cir. 1991), *amended on other grounds,* 966 F.2d 184 (6th Cir.1992). Although the court commends the entirety of the pertinent analysis in *Jennings* to the attention of the parties, *see Jennings,* 945 F.2d at 134–37, the court will satisfy itself here with an "excerpting" of the reasoning in *Jennings.*

After discussing the interpretation of "mixture or substance" in § 841 provided in *Chapman,* the court in *Jennings* observed, "At first blush, this then would

appear to be an easy case," because the "plain language" of the statute seemed to direct consideration of the entire methamphetamine "mixture" cooking in a crockpot in the defendants' sentence. *Id.* at 136. The court, however, rejected such an interpretation on the ground that it "would both produce an illogical result and be contrary to the legislative intent underlying the statute," which was a result the court would "decline to sanction." *Id.* Although the court found that it would ordinarily be a "safe assumption" to consider the entire contents of a pot of cooking methamphetamine mixture for sentencing purposes, "the Crockpot [in question] contained a small amount of methamphetamine and poisonous by-products not intended for ingestion," making the assumption "unwarranted." *Id.* In the court's view, "It seems fortuitous, and unwarranted by the statute, to hold the defendants punishable for the entire weight of the mixture when they could have neither produced that amount of methamphetamine nor distributed the mixture containing methamphetamine." *Id.* Although the court recognized that the sentencing court could have made an upward departure that equaled or exceeded the mandatory minimum sentence imposed on the basis of the weight of the entire, poisonous mixture, the reviewing court concluded that such a possibility did not excuse the sentencing court's improper calculation for mandatory minimum or base offense purposes. *Id.* at 136–37. Finally, the court concluded that the legislative intent of the statutory sentencing scheme, as described in *Chapman,* including Congress's intent that dilutants, cutting agents, and carrier mediums be included in the weight of drugs for sentencing purposes, *see id.* at 137 (citing *Chapman,* 500 U.S. at 459–60, 111 S.Ct. 1919), was not served by including poisonous or unmarketable chemicals and by-products, where there was no possibility that the mixture could be distributed to consumers. *Id.* The court therefore remanded for an evidentiary hearing on sentencing in which the determination of drug quantity was to be guided by the following rule: "If, as we suspect, the defendants are correct in their assertions as to the chemical properties of the contents of the Crockpot, it would be inappropriate for the district court to include the entire weight of the mixture for sentencing purposes. Instead, the district court would be limited to the amount of methamphetamine the defendants were capable of producing." *Id.* This rule, the court concluded, was "compelled by the legislative intent underlying the sentencing scheme of both the statute and the Sentencing Guidelines." *Id.* Thus, *Jennings* unequivocally stands for the proposition that the "unusable/unmarketable rule" should be applied to determinations of drug quantity for purposes of determining mandatory minimum sentences.

Similarly, in *United States v. Acosta,* 963 F.2d 551 (2d Cir.1992), the court considered the issue presented here in the context of both a mandatory minimum sentence and determination of a Guidelines sentencing range. In *Acosta,* the court found a "functional difference" between carrier mediums discussed in *Chapman* and the "creme liqueur" in which the defendant in the case before it had mixed cocaine. This "functional difference" led the court to "conclude that the weight of the liqueur should not have been calculated in the base offense level." *See Acosta,* 963 F.2d at 552. In *Acosta,* much as is the case here, "[t]he government concede[d] that the creme liqueur was merely a mask to conceal the cocaine and that before the cocaine could be distributed, it would have to be distilled out of the liqueur," and that "the government d[id] not contest the defendant's argument that the creme liqueur was not ingestible and therefore was not marketable." *Id.* at 553. "With that," the court concluded, "the issue becomes rather simple: Does the sentencing scheme require that the weight of an unusable portion of a mixture, which makes the drugs

uningestible and unmarketable, be included in the overall weight calculation? We think not." *Id.*

Although the government argued in *Acosta* "that *Chapman* speaks plainly and directly to the present case and mandates the inclusion of the creme liqueur in the weight calculation," the court disagreed. *Id.* at 554. The court did not find *Chapman*'s interpretation of "mixture" in § 841(b) to require a different conclusion, because of the functional difference between LSD on blotter paper and the cocaine in the creme liqueur:

> Functionally, *i.e.*, in terms of drug trafficking, the LSD and the blotter paper, like an egg and cheese omelet, became a single product. By contrast, the cocaine/creme liqueur was not an ingestible mixture, and at least one other court has noted that distilling cocaine from liquid waste is not particularly difficult. *See Rolande–Gabriel*, 938 F.2d at 1237 (government chemist easily distilled liquid waste from cocaine). *Because the creme liqueur must be separated from the cocaine before the cocaine may be distributed, it is not unreasonable to consider the liquid waste as the functional equivalent of packaging material, see id., which quite clearly is not to be included in the weight calculation. See Chapman*, 111 S.Ct. at 1926.
>
> Consequently, even though the cocaine/creme liqueur may fall within the dictionary definition of "mixture", the legislative history convinces us that the weight of the creme liqueur must be excluded. Function, not form, is critical. Congress was concerned with mixtures that will eventually reach the streets, *i.e.*, consumable mixtures. *See id.* at 1926, 1927–28 (citing House Report at 11–12, 17).

*Acosta*, 963 F.2d at 554 (emphasis added).

Developing this "functional" interpretation of "mixture" within the meaning of § 841, in the context of the market orientation recognized in *Chapman*, the court in *Acosta* reasoned as follows:

Viewed through a market-oriented prism, there is no difference in culpability between individuals bringing the identical amount and purity of drugs to market but concealing the drugs in different amounts of unusable mixtures. If, for example, A imports two kilograms of pure cocaine mixed in ten kilograms of liqueur, while B smuggles his two kilograms of pure cocaine in twenty kilograms of liqueur, they have both brought the same amount of usable drugs to market, *viz*, two kilograms of cocaine. It defies logic to say that they should be sentenced differently under a statute that was concededly designed to penalize dealers based on the amount of drugs they place on the market. Sentencing these individuals differently would not only ignore Congress' express intent, it would also fly in the face of the fundamental underpinnings of the Guidelines, namely, uniformity and proportionality in sentencing. *See* 28 U.S.C. § 991(b)(1)(B) (Sentencing Commission established to "avoid [ ] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct"); U.S.S.G., Ch. 1, Pt. A, at 1.2 (policy statement) (Congress sought uniformity and proportionality in sentencing); *United States v. Palta*, 880 F.2d 636, 639 (2d Cir.1989); *Rolande–Gabriel*, 938 F.2d at 1237.

*In stark contrast to the LSD in Chapman, the "mixture" here was useless because it was not ready for distribution at either the wholesale or the retail level.* It could not be ingested or mixed with cutting agents unless and until the cocaine was distilled from the creme liqueur. After distillation, it could be sold at the wholesale level or diluted with cutting agents and sold at the retail level. Only at that point, could Congress' rationale for penalizing a defendant with the entire amount of a "mixture" sensibly apply.

*Acosta,* 963 F.2d at 554–55 (emphasis added).

The court embraced the reasoning of the Eleventh Circuit Court of Appeals in *Rolande–Gabriel,* and specifically rejected the analysis of the First Circuit Court of Appeals in *Mahecha–Onofre. Id.* at 555. The court noted that the reliance in *Mahecha–Onofre* on Congress's supposed rationale "that 'weight' and 'purity' both, roughly speaking, correlate with the seriousness of the crime," *id.* (quoting *Mahecha–Onofre,* 936 F.2d at 626), involved a statement with which the court did not disagree; nevertheless, the court concluded that the statement presented a rationale that the court "d[id] not believe ... sufficiently disposes of the ingestibility/marketability argument." *Id.* Instead, relying on *Chapman,* 500 U.S. at 464–65, 111 S.Ct. 1919, which in turn relied on specific excerpts from the legislative history, the court in *Acosta* found that "Congress made clear that the weight of drugs sold at the wholesale or retail level, rather than their purity, is the yardstick of culpability." *Id.* Thus, "[t]he problem ... is that, under a market-oriented approach, when the mixture is not ingestible (and therefore not marketable), there is no reason to base a sentence on the entire weight of a useless mixture." *Id.* (citing *Rolande–Gabriel,* 938 F.2d at 1237).

The court in *Acosta* also rejected the government's assertion that the uningestible liqueur was a "tool of the importation trade" that should be included under *Chapman,* 500 U.S. at 466, 111 S.Ct. 1919. *Id.* at 566, 111 S.Ct. 1919. The court concluded that, unlike blotter paper for distributing LSD, the creme liqueur was not necessary to distribution, but was only a device to mask cocaine while it was being transported. *Id.* To include such a masking agent in the weight of the cocaine for sentencing purposes, on the ground that it was used to transport and conceal the cocaine, "ignores the Guidelines' touchstone of measuring culpability in drug trafficking cases—the amount of the commodity, *i.e.,* consumable or marketable drugs, that the defendant moves in the chain of distribution." *Id.* The court concluded that "it is not how one traffics in the commodity ... that is important, but, rather, how much of the commodity one transports or distributes that is relevant in calculating the weight of a controlled substance for sentencing purposes." *Id.* The court also rejected the government's attempt to "avoid *Chapman*'s discussion of Congress' market-oriented approach" by arguing that the case in question involved importation under 21 U.S.C. §§ 952, 960, not distribution under 21 U.S.C. § 841, because U.S.S.G. § 2D1.1 considered "mixture or substance" as used in § 841. *Id.*

Thus, *Acosta* also stands for the proposition that the "unusable/unmarketable rule" applies to sentencing for either mandatory minimum or Guideline sentencing purposes, even in the absence of the amendment of the applicable Guideline incorporating the rule.

Certain cases in this category may be surveyed more briefly. In *United States v. Rodriguez,* 975 F.2d 999 (3d Cir.1992), the Third Circuit Court of Appeals reached a conclusion similar to that reached by the Ninth Circuit Court of Appeals in *Robins,* discussed *supra* at page 39. First, the court in *Rodriguez* concluded that, under the interpretation provided in *Chapman,* there was no "mixture" of cocaine and boric acid, where the two substances were not commingled in a bag, but instead were kept separated, with the cocaine visible and accessible, to give buyers a false impression that the entire bag contained cocaine. *Rodriguez,* 975 F.2d at 1005. Moreover, even if the cocaine had been further "cut" with the boric acid, the resulting mixture would have been "unmarketable," while *Chapman* only required inclusion of cocaine that could have been sold and consumed. *Id.* The court also read *Chapman* to suggest that Congress was concerned with mixtures that would eventually reach the streets, *i.e.,* "consumable" mixtures, rather than a

situation in which the cocaine and boric acid were not "mixed," and even if they were mixed, the resulting product would have been rendered "unsalable and unusable—and probably even toxic." *Id.* at 1006. The court then reviewed decisions distinguishing *Chapman* on the basis of the salability or usability of the mixture in question, including *Rolande-Gabriel, Jennings,* and *Acosta,* and noted that the only dissenting view had been presented in *Mahecha-Onofre. Id.* at 1007. The court in *Rodriguez* concluded that "the usable/unusable differentiation adopted by the Second, Sixth, Ninth, and Eleventh Circuits, rather than the First Circuit approach, best follows the reasoning in *Chapman." Id.* In addition, the court found this rule was more consistent with the uniformity and proportionality goals of the Sentencing Guidelines. *Id.* Therefore, the court concluded that the packages of cocaine and boric acid were not "mixtures," and that, even if they were "mixtures," they were not readily usable, and thus only the weight of the usable cocaine provided a basis for sentencing. *Id.*

The most confusing of the cases handed down prior to the amendment to U.S.S.G. § 2D1.1, application note 1, which adopted the "unusable/unmarketable rule" for Guideline sentencing purposes, are those decided by the Fifth Circuit Court of Appeals. In *United States v. Palacios-Molina,* 7 F.3d 49 (5th Cir.1993), a cocaine case, the Fifth Circuit Court of Appeals recognized the split in authority among the Circuit Courts of Appeals. *See Palacios-Molina,* 7 F.3d at 51–52. The court added that, while it had not faced the issue as to cocaine, it had concluded that, as to methamphetamine, toxic liquid by-products from the manufacture of methamphetamine that contained trace quantities of the drug are "mixtures" within the meaning of U.S.S.G. § 2D1.1, so that the gross weight of such liquids are includible in the weight calculation for sentencing. *Id.* at 52 (citing *United States v. Anderson,* 987 F.2d 251, 258 (5th Cir.), *cert. denied,* 510 U.S. 853, 114 S.Ct. 157, 126 L.Ed.2d 118

(1993); *United States v. Ruff,* 984 F.2d 635, 640 (5th Cir.), *cert. denied sub nom. Persyn v. United States,* 510 U.S. 834, 114 S.Ct. 108, 126 L.Ed.2d 74 (1993); *United States v. Walker,* 960 F.2d 409, 412 (5th Cir.), *cert. denied,* 506 U.S. 967, 113 S.Ct. 443, 121 L.Ed.2d 362 (1992); *United States v. Sherrod,* 964 F.2d 1501, 1509–10 (5th Cir.), *cert. dismissed,* 506 U.S. 1041, 113 S.Ct. 834, 122 L.Ed.2d 111 (1992); *United States v. Mueller,* 902 F.2d 336, 345 (5th Cir.1990); *United States v. Butler,* 895 F.2d 1016, 1018 (5th Cir.1989), *cert. denied* 498 U.S. 826, 111 S.Ct. 82, 112 L.Ed.2d 54 (1990); *United States v. Baker,* 883 F.2d 13, 15 (5th Cir.), *cert. denied,* 493 U.S. 983, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989)).

However, the court in *Palacios-Molina* concluded that the "market-oriented analysis" set forth in *Chapman* was not intended to apply to methamphetamine or PCP. *Id.* at 53. The court concluded,

[T]here are rational reasons, aside from their disparate treatment under the Guidelines and under *Chapman,* to distinguish the liquid waste in the instant case and the liquid waste in the manufacture of methamphetamine. In the case at bar, the liquid in the wine bottles was an otherwise innocuous liquid. Its only purpose was to conceal the drug during transportation. By contrast, the liquids involved in the methamphetamine cases were either precursor chemicals or by-products of the manufacturing process. These are not otherwise innocuous liquids. Rather, they are necessary to the manufacturing and thus the ultimate distribution of the controlled substance. *United States v. Robins,* 967 F.2d 1387, 1390 (9th Cir.1992).

Accordingly, our decisions with regard to methamphetamine should not dictate a result in this case. There are rational reasons to distinguish between methamphetamine by-products and the liquid waste in this case. Further, in light of the Sentencing Commission's recent proposed amendments submitted to Con-

gress [including the amendment to U.S.S.G. § 2D1.1, application note 1], we see no reason to extend our methamphetamine holdings to waste liquids in cocaine trafficking as this has already become superseded law. Lastly, *Chapman*'s market-oriented analysis does not apply to methamphetamine. It does, however, apply to cocaine.

*Palacios–Molina*, 7 F.3d at 53.

Proceeding "unfettered by precedent," the court in *Palacios–Molina* then found that the "unusable/unmarketable rule" should apply to cocaine:

> In *Chapman*, the blotter paper was part of the usable substance that was to be distributed on the market. It decreased the purity of the LSD and increased the bulk of the noxious material to be distributed. This is very different from the case before us, though. Here, the liquid in which the cocaine was distilled was not to be marketed as part of a usable substance with the drug. Rather, it had to be removed before the drug was marketed. It affected neither the purity nor the bulk of the substance that was to be marketed. Though this liquid/cocaine substance probably met the ordinary definition of the term mixture, it was not a usable mixture that would ever reach the streets.

*Palacios–Molina*, 7 F.3d at 54. The court concluded that the liquid in the wine bottles in the case before it was "akin to the packaging material found not to be includible in *Chapman*," as it was easily distinguishable and separable from the cocaine, and to include the liquid for U.S.S.G. § 2D1.1 purposes "would lead to unjust results." *Id.* The court also rejected the government's assertion that the liquid was a tool of transport, because the focus of the proper analysis was not how the defendant moves the drug, but how much of the marketable drug the defendant moves. *Id.* Thus, in its pre-amendment Guidelines sentencing cases, the Fifth Circuit Court of Appeals applied the "unusable/unmarketable rule" to cocaine, but not to meth-

amphetamine, at least when the medium involved in the methamphetamine cases was unusable or toxic by-products of manufacturing the methamphetamine. This conclusion should be contrasted with the conclusion of the Sixth Circuit Court of Appeals in *Jennings*, 945 F.2d at 134–37, discussed *supra*, beginning at page 915, in which the court concluded that toxic by-products of manufacturing methamphetamine found in a crockpot where the methamphetamine was still cooking could *not* be included in the weight of the methamphetamine for either statutory or Guidelines sentencing purposes.

The last of the pertinent pre-amendment cases to be examined here, *United States v. Johnson*, 999 F.2d 1192 (7th Cir.1993), decided July 29, 1993, brought the Seventh Circuit Court of Appeals within the group of courts to adopt the "unusable/unmarketable rule." In *Johnson*, the government argued that waste water from the manufacturing process for cocaine base should be included in the total weight of the cocaine for sentencing purposes, on the ground that the cocaine residue and waste water were " 'two substances blended together so that the particles of one are diffused among the particles of the other.' " *Johnson*, 999 F.2d at 1195 (quoting *Chapman*, 500 U.S. at 462, 111 S.Ct. 1919). The court, however, rejected this argument, because the court "d[id] not agree that Congress intended or that *Chapman* requires such a narrow understanding of the term 'mixture' in this context." *Id.* The court concluded that "[t]he *Chapman* Court's inclusion of the weight of the blotter paper is rational in light of congressional intent and the unique characteristics of LSD." *Id.* However, the court reasoned,

> The unique characteristics of LSD do not exist in the present case. The waste water does not serve as a dilutant, cutting agent or carrier medium for the cocaine base. It does not "facilitate the distribution," *Chapman*, 500 U.S. at 465–66, 111 S.Ct. at 1928, of the cocaine in that cocaine is not dependent on the

water for ingestion, and unlike a dilutant or cutting agent, the waste water does not in any way increase the amount of drug available at the retail level. The liquid, with just a trace of cocaine base, is merely a by-product of the manufacturing process with no use or market value. The waste water is not ready for distribution at the wholesale or retail level because it will never be distributed at all. Under a market-oriented approach, when the mixture is not ingestible and therefore not marketable, there is no rational basis to a sentence based on the entire weight of a useless mixture. *United States v. Acosta*, 963 F.2d at 555.

To read the statute or *Chapman* as requiring inclusion of the weight of all mixtures, whether or not they are useable, ingestible, or marketable, leads to absurd and irrational results contrary to congressional intent. The defendant asks us to imagine a marijuana farmer who harvests his crop, leaving a few traces of the illegal plants on the ground. The farmer then plows his field to prepare for next year's crop and in so doing mixes the traces of marijuana with the soil. Is the farmer accountable for all the marijuana he harvested as well as the combined weight of all his topsoil? As the Second Circuit pointed out, it is function not form that is critical. *Acosta*, 963 F.2d at 554. Congress was clearly concerned with mixtures that will eventually reach the streets, *i.e.*, consumable mixtures. *Chapman*, 500 U.S. at 462, 466–67, 111 S.Ct. at 1926, 1927–28.

*Johnson*, 999 F.2d at 1196. The court in *Johnson* also found that "broad application of *Chapman*, as urged by the government, undermines the primary concern of the Sentencing Guidelines in promoting rational and uniform sentences." *Id.* at 1196–97.

The court in *Johnson* concluded,

We do not dispute that cutting agents and dilutants can be factored into the weight calculation. Nor do we have a case where a suitcase or object is the carrier medium of a blended drug. In the present case, the waste water was not a carrier and was not a useable, ingestible or marketable mixture. We hold that it was error to include the weight of the liquid in the sentencing calculus.

*Johnson*, 999 F.2d at 1197. Thus, *Johnson* also supports application of the "unusable/unmarketable rule" to the determination of Ochoa–Heredia's mandatory minimum sentence.

***ii. Post-amendment applications.*** Unlike the pre-amendment cases, which this court finds provide considerable insight into the applicability of the "unusable/unmarketable rule" to determination of drug quantity for purposes of mandatory minimum sentences, the post-amendment cases are surprisingly little help. For example, in *United States v. Jackson*, 115 F.3d 843 (11th Cir.1997), a post-amendment case, the Eleventh Circuit Court of Appeals specifically applied the "unusable/unmarketable rule" to determination of the weight of cocaine, but only for Guidelines sentencing purposes. *See Jackson*, 115 F.3d at 845–49. It did so without ever mentioning the defendant's mandatory minimum sentence. In *Jackson*, the court concluded that, for Sentencing Guideline purposes, a package containing 1104.4 grams of sugar and 10 grams of cocaine, which had been constructed so that the cocaine was originally contained in an area at the surface of the block, did not contain a "mixture" of over 1000 grams containing a detectable amount of cocaine. *Id.* at 848. Instead, the court relied on evidence that, as packaged, the cocaine was not marketable, and probably would not have been detectable if fully mixed with the sugar. *Id.* Although the sugar was "consumable" and sugar was commonly used as a "cutting agent," the sugar was not used in this case as a cutting agent, but to trick a purchaser into thinking the entire package contained cocaine. *Id.* Consistent with *Rodriguez* and *Robins*, discussed *supra*, beginning at page 912 and page 918, respectively, the

Eleventh Circuit Court of Appeals found that combining the sugar and cocaine would have resulted in an unmarketable mixture. *Id.* Therefore, the court concluded that the contents of the package were not a "mixture" for Guidelines sentencing purposes and the defendant's sentence should have been based on ten grams of cocaine. *Id.* at 848–49. Because no mandatory minimum sentence was at issue, this case sheds little light on whether the "unusable/unmarketable rule" should be applied to a determination of a mandatory minimum sentence, the specific question in this case.

Although in *Jackson,* the Eleventh Circuit Court of Appeals concluded that the "unusable/unmarketable rule" applied to Guideline sentencing ranges after the amendment to U.S.S.G. § 2D1.1, in *United States v. Pope,* 58 F.3d 1567 (11th Cir. 1995), *cert. denied,* 517 U.S. 1211, 116 S.Ct. 1831, 134 L.Ed.2d 935 (1996), the court held that "the entire weight rule of *Chapman* must still be followed for purposes ... of the mandatory, minimum sentences for an LSD conviction despite Guidelines' amendments." *Pope,* 58 F.3d at 1572. Thus, at least for LSD cases, the Eleventh Circuit Court of Appeals distinguishes between the tests for weight of controlled substances for sentencing purposes, applying a "whole weight" test purportedly based on *Chapman* for mandatory minimum sentences and the "unusable/unmarketable test" for Guidelines sentencing purposes. Indeed, this is the situation for LSD as confirmed by the Supreme Court in *Neal. See, e.g., United States v. Eggersdorf,* 126 F.3d 1318, 1321 n. 2 (11th Cir.

1997) (recognizing that "[t]he Supreme Court ultimately reached the same conclusion [as in *Pope* ] in *Neal v. United States,* 516 U.S. 284, 116 S.Ct. 763, 133 L.Ed.2d 709 (1996)."), *cert. denied,* 523 U.S. 1013, 118 S.Ct. 1204, 140 L.Ed.2d 332 (1998).

Similarly, in *United States v. Brinton,* 139 F.3d 718 (9th Cir.1998),[10] a methamphetamine case, the Ninth Circuit Court of Appeals found that no mandatory minimum sentencing issue was presented, because the offenses involved carried mandatory minimum sentences of 10 years, and the defendant had been sentenced to 121 months. *Brinton,* 139 F.3d at 721. The defendant appealed, however, on the ground that the sentencing court's determination of the quantity of drugs had erroneously prevented the application of the "safety valve." *Id.* Nevertheless, only Guidelines sentencing issues were presented in *Brinton. See id.* at 722.[11] The case involved 2,401 grams of a material that the defendant contended should not have been counted, because it was nothing more than unmarketable waste product. *Id.* At the sentencing hearing, a chemist testified that samples from the mixture tested at only 15–32% methamphetamine, and that the material was unmarketable and probably too dangerous for human consumption. *Id.*

Although the Ninth Circuit Court of Appeals recognized that, for example, in its prior decision in *Beltran–Felix,* 934 F.2d at 1076, it had used the entire weight of a mixture to determine the appropriate sentence, the 1993 amendment to U.S.S.G. § 2D1.1, application note 1, changed the

---

10. *Brinton* has been overruled by *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), on the question of whether the jury or the court determines quantity for purposes of a mandatory minimum sentence, a question not pertinent to the decision now before this court. *See United States v. Nordby,* 225 F.3d 1053, 1059 (9th Cir.2000); *see also United States v. Kroeger,* 229 F.3d 700, 703 (8th Cir.2000) (rejecting *Brinton* on the question of grouping offenses for purposes of determining offense level).

11. *Compare United States v. Powers,* 194 F.3d 700, 706 (6th Cir.1999) (the "whole weight rule" of *Chapman* and *Neal* does not apply to a case in which the "safety valve" is applicable, because, in such cases, the mandatory minimum sentence is irrelevant; instead, the court determines quantity under the "unusable/unmarketable rule").

rule for Guideline sentencing purposes. *Id.* The court explained,

> If the sentencing court finds that the material seized was in a distributable form, the entire weight counts at sentencing. If, however, the material required further processing prior to distribution, only the weight of the pure drug is included. [*United States v. Innie,* 77 F.3d 1207, 1209 (9th Cir.1996) ] (applying the 1993 amendment to U.S.S.G. § 2D1.1 and ruling that only the average of the mixture that was usable methamphetamine should be used in calculating defendant's sentence).

> The Supreme Court's holdings in *Neal v. United States,* 516 U.S. 284, 116 S.Ct. 763, 133 L.Ed.2d 709 (1996), and *Chapman v. United States,* 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), are not to the contrary. Both *Neal* and *Chapman* dealt with LSD and whether the weight of the blotter paper used to hold the drug should be included in the weight used at sentencing. Both cases held that it should, but noted that LSD is normally distributed after dilution by some form of inert carrier. The law was designed to punish on the basis of the amount of drug distributed, rather than the amount of pure drug. *Neal,* 516 U.S. at 288–90, 116 S.Ct. at 766; *Chapman,* 500 U.S. at 461, 111 S.Ct. at 1925. Additionally, *Chapman* observed that the guidelines treat methamphetamine differently from LSD. *Chapman,* 500 U.S. at 459, 111 S.Ct. at 1924. Therefore, *Chapman* and *Neal* do not require that the entire weight of the mixture be used in establishing the sentence in Brinton's case.

*Brinton,* 139 F.3d at 722–23. The court concluded that, upon remand, the sentencing court would be required to determine what amount of the 2,401 gram mixture was attributable to pure methamphet-

amine. *Id.* at 723. Thus, *Brinton* does no more than recognize a "dual system" for sentencing in methamphetamine cases, as in LSD cases. It does not embrace or necessarily suggest application of the "unusable/unmarketable rule" to determinations of drug quantity for purposes of determining mandatory minimum sentences.

Nor does the earlier decision of the Ninth Circuit Court of Appeals in *United States v. Sprague,* 135 F.3d 1301 (9th Cir. 1998), involve a mandatory minimum sentencing issue. In *Sprague,* the court stated that it was "not asked today to revisit the mandatory minimum sentence calculation under the statute in light of Amendment 484 [to U.S.S.G. § 2D1.1, application note 1]." *Id.* at 1306 n. 4. However, the court did note that "other courts have employed the marketable material approach to exclude materials that must be separated from the controlled substance from the calculation of mandatory minimum sentences under 21 U.S.C. § 841," and that the Ninth Circuit Court of Appeals had itself rejected application of the rule in those circumstances in *Beltran–Felix,* 934 F.2d at 1076. *Id.*[12]

Indeed, the court can find no decision of a Circuit Court of Appeals, or indeed, of any federal court, *after* the amendment to U.S.S.G. § 2D1.1, application note 1, that specifically applies the "unusable/unmarketable rule" to determination of a mandatory minimum sentence, with the exception of the dissenting opinion in *Richards.*

### C. Applicability Of The "Unusable/Unmarketable Rule"

Decisions rendered after the amendment to U.S.S.G. § 2D1.1, application note 1, seem to be unanimous that the "unusable/unmarketable rule," as stated in that amended Guideline, is now controlling on determinations of Guideline sentencing

---

**12.** The decisions that the Ninth Circuit Court of Appeals characterized as applying the "unusable/unmarketable rule" to mandatory minimum sentences, all pre-amendment cases, are identified as *Acosta,* 963 F.2d at 553–56;

*Rodriguez,* 975 F.2d at 1004–07; *Palacios–Molina,* 7 F.3d at 53–54; *Jennings,* 945 F.2d at 135–37; *Johnson,* 999 F.2d at 1192; and *Rolande–Gabriel,* 938 F.2d at 1237.

ranges, but that unanimity settles nothing in a case, like the present one, where the mandatory minimum sentence is *higher* than any sentence within the Guideline sentencing range. Here, pursuant to U.S.S.G. § 5G1.1(b), Ochoa–Heredia's statutory mandatory minimum sentence, whether it is five years or ten years, "trumps" his sentencing range of 46 to 57 months under the United States Sentencing Guidelines. Therefore, the only question is whether Ochoa–Heredia is subject to a five-year or ten-year mandatory minimum sentence, and the answer to that question in turn rides on what method is used to calculate drug quantity for purposes of determining a mandatory minimum sentence under the statute. With the guidance of the decisions of the Circuit Courts of Appeals discussed above, the court now turns to that question in this case.

### 1. Proper framing of the question

The majority of the *en banc* court of the Tenth Circuit Court of Appeals in *Richards* initially framed the question before it in the following terms: "This case requires us to determine whether a combination of liquid by-products and methamphetamine constitute a 'mixture or substance containing a detectable amount of methamphetamine' for purposes of sentencing under 21 U.S.C. § 841(b)." *Richards,* 87 F.3d at 1153. However, the majority then recast the question on which it had granted *en banc* review in such a way as virtually to assure the conclusion it reached. Specifically, the majority recast the question as "whether the Sentencing Commission's amended construction of 'mixture or substance' authoritatively defines the terms 'mixture or substance' in § 841, or whether the statutory terms retain their plain meaning as construed by the Supreme Court in *Chapman v. United States,* 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991)." *Id.* at 1154. Cast in such terms, the majority's conclusion that the "unusable/unmarketable rule" did not apply to determination of mandatory minimum sen-

tences would seem to follow directly from *Neal,* which the majority characterized—this court must agree, properly characterized—as "reaffirm[ing] that *Chapman* sets forth the governing definition of 'mixture or substance' for purposes of § 841," and more specifically, as holding "that *Chapman*'s plain meaning interpretation of 'mixture or substance' governs the determination of a defendant's statutory mandatory minimum sentence under § 841, even where the Sentencing Commission adopts a conflicting definition in the sentencing guidelines." *Id.* at 1156–57 (citing *Neal,* 516 U.S. at 294–96, 116 S.Ct. 763). This court must necessarily agree with the proposition that the Supreme Court's interpretation of a statute cannot be overridden by an agency, both because *Neal* told us so, *see Neal,* 516 U.S. at 290, 116 S.Ct. 763, and because the Sentencing Commission said so, at least with regard to its amendment of the Sentencing Guidelines applicable to LSD inaugurating the "presumptive dosage" regime, the amendment by the Sentencing Commission at issue in *Neal. See id.* at 294, 116 S.Ct. 763 (citing 1995 U.S.S.G. § 2D1.1, cmt., backg'd). This case, however, is not *Neal,* either in terms of the drug and amendment to the Guidelines involved, or as to the question presented.

The dissenters in *Richards,* this court finds, properly stated the question as the "construction of 21 U.S.C. § 841(b)." *Richards,* 87 F.3d at 1158 (Seymour, C.J., dissenting). Moreover, this court concludes, the dissenters properly characterized the majority's position and the reasons for not embracing that position:

The majority bases its construction of 21 U.S.C. § 841(b) upon its determination that the Supreme Court's ruling in *Chapman v. United States,* 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), governs this case. I agree with that premise, but not with the majority's reading of *Chapman.* The majority has divorced the holding in *Chapman* from its underlying circumstances and ratio-

nale, and has applied the holding to produce a result which in this case is directly at odds with that rationale.

*Richards,* 87 F.3d at 1158. Because this court agrees with much of the reasoning of the dissenters in *Richards* and the majority of the Circuit Courts of Appeals to consider the question of the applicability of the "unusable/unmarketable rule" to determination of mandatory minimum sentences, this court concludes that the weight of the "unusable" and "unmarketable" medium in which the methamphetamine in this case was contained cannot be counted for purposes of determining Ochoa–Heredia's mandatory minimum sentence.

## 2. Plain meaning and legislative intent

■ This court has, on numerous occasions, pointed out that the first approach to statutory interpretation is the "plain language" of the statute in question. *See, e.g., Rouse v. Iowa,* 110 F.Supp.2d 1117, 1124–25 (N.D.Iowa 2000); *Hoffman v. Cargill, Inc.,* 59 F.Supp.2d 861, 871 n. 6 (N.D.Iowa 1999); *Adler v. I & M Rail Link, L.L.C.,* 13 F.Supp.2d 912, 932 n. 10 (N.D.Iowa 1998); *Rural Water Sys. # 1 v. City of Sioux Center, Iowa,* 967 F.Supp. 1483, 1516 (N.D.Iowa 1997), *aff'd,* 202 F.3d 1035 (8th Cir.2000), *cert. denied,* — U.S. —, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Sicard v. City of Sioux City, Iowa,* 950 F.Supp. 1420, 1436 n. 7 (N.D.Iowa 1996). The court does not retreat from that position now, although it does now reiterate the caveats to that rule pointed out by the dissenters in *Richards.* As the dissenters in *Richards* point out, this court must " 'effectuate the intent reflected in the language of the enactment and the legislative process,' " *id.* (quoting *Colorado v. Idarado Mining Co.,* 916 F.2d 1486, 1494 (10th Cir.1990)), but it is "not required to 'produce a result demonstrably at odds with the intentions of [the statute's] drafters.' " *Id.* (quoting *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)) (other internal quotation marks omitted). For that reason, the dissenters noted that "[t]he Court in *Chapman* looked for Congress' intent in both the language of 21 U.S.C. § 841 and in its legislative history," *id.* at 1159 (citing *Chapman,* 500 U.S. at 460–61, 111 S.Ct. 1919), and this court must do the same.

This court agrees with the dissenters in *Richards* that, in *Chapman,* "[t]he Court found that 'Congress adopted a "market-oriented" approach to punishing drug trafficking, under which the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence.' " *Id.* at 1159 (quoting *Chapman,* 500 U.S. at 461, 111 S.Ct. 1919). What this court finds so troubling is the wide range of conclusions the Circuit Courts of Appeals have reached regarding the impact of this "market-oriented approach" of Congress and *Chapman* on the determination of mandatory minimum sentences. Some courts, like the majority in *Richards,* have taken the "market-oriented approach" to mean that the defendant is responsible for the quantity of drugs based on whatever form they happened to be in when seized. *See, e.g., Richards,* 87 F.3d at 1156 (majority opinion); *Mahecha–Onofre,* 936 F.2d at 626. However, other courts, as shall be explained in more detail below, have applied reasoning this court finds more persuasive to conclude that the "market-oriented approach" reflected in the statute, the legislative history, and *Chapman* requires the court to exclude the weight of an unusable or unmarketable medium for purposes of determining a mandatory minimum sentence.

However, the court must first consider the "plain meaning" of the statute at issue without necessarily taking recourse to the rationale offered by Congress. First, it is plain that "mixture or substance" must mean the *same thing* as applied to LSD, heroin, and cocaine under subsections of § 841(b) as it does when applied to subsections concerning methamphetamine, *see,*

*e.g.,* 21 U.S.C. § 841(b)(1)(B)(viii), even though the latter provisions include both a "mixture or substance" alternative and a "pure" or "actual" methamphetamine alternative. Indeed, the "legislative intent" to be discerned from the difference between the provisions for LSD, on the one hand, and methamphetamine, on the other, must be that Congress recognized that LSD cannot practicably be "marketed" except in the form of a "mixture or substance," *see, e.g., Chapman,* 500 U.S. at 457, 111 S.Ct. 1919 (recognizing that a pure dose of LSD is such an infinitesimal amount that it must be sold to retail customers in a "carrier," construed by the court to be a "mixture or substance"), while methamphetamine is routinely "marketed" in both a "mixture or substance" form and a "pure" form. This difference more sensibly accounts for the difference in treatment in the statute between LSD, heroin, and cocaine, on the one hand, and PCP and methamphetamine, on the other, which some courts have seized upon in the discussion in *Chapman* as justifying the conclusion that the "marketability" rule, to the extent it was adopted in *Chapman,* was not meant to apply to methamphetamine. *Contra Palacios–Molina,* 7 F.3d at 53 (concluding that the "market-oriented analysis" set forth in *Chapman* was not intended to apply to methamphetamine or PCP, and therefore recognizing the "unusable/unmarketable rule" for cocaine, but not for methamphetamine). Thus, "mixture or substance" must be construed the same way for methamphetamine as for LSD.

A further implication of legislative intent follows from the inclusion of language that plainly allows the court to consider *either* the amount of "actual" or "pure" methamphetamine or the quantity of a "mixture of substance" containing methamphetamine for purposes of determining mandatory minimum sentences under § 841(b). That implication is that, in certain circumstances, Congress recognized that it may not be either *possible* or *appropriate* to determine the quantity of methamphetamine based upon a "detectable amount" in a "mixture or substance." The court acknowledges that, when both measurements are possible, the Sentencing Commission has opted for application of the measurement that imposes the *higher* sentence. *See* U.S.S.G. § 2D1.1(c), Note B. Nevertheless, as *Neal* indicates, policy determinations by the Sentencing Commission do not drive the determination of "plain meaning" or "legislative intent" behind the statutes establishing mandatory minimum sentences. *See Neal,* 516 U.S. at 294–95, 116 S.Ct. 763. Thus, where the mandatory minimum sentencing provision specifically leaves the door open to consideration of quantity based on either "actual" methamphetamine or a "mixture or substance containing a detectable amount of methamphetamine," it is difficult to see how the language of the statute forecloses a determination based on *either* measurement, and recognition of the "unusable/unmarketable rule" follows from a reading of the choice of "pure" methamphetamine provided in the statute, as such a reading is reflective of Congress's "market-oriented" approach. The dissenters in *Richards* reached a similar conclusion, when they concluded that "Congress' 'market-oriented' approach dictates that we not treat unusable drug mixtures as if they were usable." *Richards,* 87 F.3d at 1159 (Seymour, C.J., dissenting); *see also id.* at 1161 (concluding that *Chapman* was not to the contrary, because including usable carriers of LSD furthers the "market-oriented approach," while inclusion of unusable mediums for methamphetamine does not). The language of the mandatory minimum sentencing provisions for methamphetamine plainly *permits* the court to make a distinction between weight based on a usable or unusable medium by providing alternative measures of the drug, in terms of a "mixture or substance" or in terms of "actual" or "pure" methamphetamine, upon which the mandatory minimum sentence is to be based.

### 3. Guidance of other courts

■ Turning specifically to the guidance provided by other decisions considering application of the "unusable/unmarketable rule" to mandatory minimum sentence determinations, the court reaches the following conclusions. First, this court is persuaded that unusable, unmarketable, or toxic mediums containing methamphetamine should be excluded from calculation of the weight of the methamphetamine for purposes of determining mandatory minimum sentences. Several courts have distinguished the "usable" carrier in LSD cases from "unusable" mediums in cases involving other controlled substances. For example, in *Rolande–Gabriel*, the Eleventh Circuit Court of Appeals reasoned that LSD on blotter paper was "ready for sale, use, or consumption," but the contents of the bags in question in that case had to be subjected to a chemical extraction process before the cocaine could be ready for sale. *See Rolande–Gabriel*, 938 F.2d at 1237. Here, it is undisputed that the methamphetamine must be extracted from the toxic medium, whether that medium is freon or not, by some chemical process before the methamphetamine is usable. Thus, as in *Rolande–Gabriel*, the medium here is in the nature of "packaging," not a salable constituent of the methamphetamine product. *See id.* To put it another way, this court is persuaded by the "functional" approach adopted by the Second Circuit Court of Appeals in *Acosta*, 963 F.2d at 554. "Because the [freon medium] must be separated from the [methamphetamine] before the [methamphetamine] may be distributed, it is not unreasonable to consider the [freon medium] as the functional equivalent of packaging material, see [*Rolande–Gabriel*, 938 F.2d at 1237], which quite clearly is not to be included in the weight calculation [under *Chapman* ]." *Acosta*, 963 F.2d at 554.[13]

Moreover, what is involved here is the sort of " 'hypothetical case' " envisioned in *Chapman*, in which " 'very little [drug]' " is found in a " 'heavy carrier' " —indeed, an unusable or unmarketable carrier, because the carrier is toxic. *See Rolande–Gabriel*, 938 F.2d at 1237–38 (quoting *Chapman*, 500 U.S. at 466, 111 S.Ct. 1919). Thus, this case, like *Rolande–Gabriel*, "presents a hypothesis which has become reality," and the "real facts present in this case . . . are dramatically different from *Chapman* " in ways "this court cannot overlook." *Id.* at 1238.

This case does not even raise what this court perceives to be the more difficult question presented in cases like *Jennings*, 945 F.2d at 134–37, *Newsome*, 998 F.2d at 1578–79, and discussed in *Palacios–Molina*, 7 F.3d at 54, which involved whether or not by-products of methamphetamine production, even toxic ones, should be included in the determination of the weight of drugs for mandatory minimum sentencing purposes. Here, the parties agree, and the evidence shows, that whatever the medium is, it is not part of or a by-product of methamphetamine production. In fact, other than the controlled substance in question—an artificial and textually unsupportable difference this court has rejected above as a basis for deciding whether or not the "unusable/unmarketable rule" applies—and the fact that the medium is indeed toxic, this case stands very close to *Palacios–Molina*. In that case, the Fifth Circuit Court of Appeals distinguished between "liquid waste" that was not a by-product of production of the controlled substance, and precursor chemicals or by-products of the manufacturing process, excluding the first kind of substance from the weight for mandatory minimum sentencing purposes in a cocaine case, and including the latter in a methamphetamine case. *See Palacios–Molina*, 7 F.3d at 53. Similarly, here, the medium is neither a

---

13. This is not, however, the sort of "packaging" case presented in either *Robins*, 967 F.2d at 1388–89 or *Rodriguez*, 975 F.2d at 1005–06. There is no suggestion from the record that the medium was intended to disguise the amount of methamphetamine actually in the bottles from would-be buyers.

pre-cursor chemical, nor a by-product of the manufacturing process, but is instead merely "waste" from which the methamphetamine must be extracted before it can be used, even if it might meet the "ordinary dictionary definition" of a "mixture or substance." *Cf. Palacios–Molina*, 7 F.3d at 54 (the liquid waste had to be removed before the cocaine was marketed and was not marketed as part of the salable substance with the drug, and therefore was excluded from the calculation, even if it fit the "ordinary dictionary definition" of "mixture or substance").

The court acknowledges—again, notwithstanding the fact that the government did not specifically assert such an argument—that the freon medium here may, in some tenuous way, have "facilitated" the distribution of the controlled substance.[14] *See Rolande–Gabriel*, 938 F.2d at 1237 (suggesting that a medium that facilitates distribution or conceals the controlled substance may be includible). Nevertheless, the freon medium here is not the sort of "cutting agent" or "standard carrier medium" that ordinarily facilitates the sale and distribution of methamphetamine, or increases the amount of the drug available for sale. *See id.; see also Johnson*, 999 F.2d at 1196. Nor is there any evidence that the freon medium was somehow intended to "conceal" the presence of the methamphetamine—and certainly it failed to do so in this case, as the drug dog called to the scene "alerted" to the presence of the methamphetamine notwithstanding that the methamphetamine was in the freon medium. Moreover, as the court in *Acosta* suggested, a substance used "merely [as] a mask to conceal the [controlled substance]" that had to be removed before the controlled substance could be distributed, and was itself neither ingestible nor

marketable, cannot, in keeping with the legislative intent of the mandatory minimum sentencing regime, be counted toward the weight of the controlled substance. *See Acosta*, 963 F.2d at 553–54. Instead, in the circumstances presented here, culpability under the mandatory minimum sentencing regime is more logically based upon the quantity of *usable* and *marketable* methamphetamine that the defendant possessed. *Id.* at 554–55.

On this point, the toxicity of the medium is also an important distinction between this case and the blotter paper loaded with LSD in *Chapman*. As the Sixth Circuit Court of Appeals observed in *Jennings*, it may well be a "safe assumption" that any medium in which methamphetamine is found should be counted against the possessor for purposes of determining a mandatory minimum sentence. *See Jennings*, 945 F.2d at 136. However, that "safe assumption" is "unwarranted" where the medium contains a small amount of methamphetamine and the medium is poisonous and not intended for ingestion. *Id.*

This court parts company with the dissenters in *Richards* only to the extent that they relied, in support of application of the "unusable/unmarketable rule" to mandatory minimum sentences, upon the "congruence" between the regime for determining quantity for Guidelines sentencing purposes under the 1993 amendment to application note 1 of U.S.S.G. § 2D1.1 and the application of the "unusable/unmarketable rule" for purposes of determining mandatory minimum sentences. *See Richards*, 87 F.3d at 1160 (Seymour, C.J., dissenting). Although such congruence may be a "bonus" arising from the application of the "unusable/unmarketable rule" rule to statutory mandatory minimum sentences, it is not a factor this court believes is persua-

---

14. The government in fact agreed during the sentencing hearing that the medium at issue here was not a "carrier medium," and that further processing was required before the methamphetamine could be used, and never suggested that the medium was intended to disguise or conceal the methamphetamine in the bottles. Nevertheless, the government's theory of the case appears to be that the methamphetamine was transported in the medium for purposes of distribution, and thus, the government at least implicitly suggests that the medium "facilitated" the distribution.

sive in statutory interpretation. In statutory interpretation, the proper sort of "congruence" to consider is among provisions of a statute and between a certain interpretation of one provision and the legislative policies the Act and the specific provision were intended to serve, *see, e.g., Harmon Indus., Inc. v. Browner*, 191 F.3d 894, 899 (8th Cir.1999) ("This 'plain language' or 'plain meaning' rule of interpretation is not limited to the meaning of individual terms; rather, '[s]uch an inquiry requires examining the text of the statute as a whole by considering its context, object, and policy.' ") (quoting *Pelofsky v. Wallace*, 102 F.3d 350, 353 (8th Cir.1996)), not between a statutory regime and an essentially administrative regime, such as the United States Sentencing Guidelines.[15] Moreover, the Supreme Court's decision in *Neal* seems to suggest that such "congruence" is of little import, and it is instead permissible for a "dual system" of sentencing to prevail under the statutory mandatory minimum provisions and the Sentencing Guidelines. *See Neal*, 516 U.S. at 296, 116 S.Ct. 763 (affirming the judgment of the Seventh Circuit Court of Appeals that a "dual system" for sentencing applies in LSD cases). This court does not read either the mandatory minimum sentencing provision or *Chapman* to require such a "dual system" where methamphetamine is found in an unusable, unmarketable, and toxic medium.

## III. CONCLUSION

Neither the plain language of the mandatory minimum sentencing statute nor interpretation of that statute in *Chap-*

*man* precludes application of the "unusable/unmarketable rule" in this case. Indeed, proper consideration of the language of the statute and the legislative intent behind it, as interpreted in *Chapman*, and further clarified by decisions of the Circuit Courts of Appeals to consider the question, warrant the application of the "unusable/unmarketable rule" to the quantity of methamphetamine in this case for the purpose of determining Ochoa–Heredia's mandatory minimum sentence. Although the medium in the bottles in question here weighed more than 3,000 grams, the proper quantity for purposes of determining Ochoa–Heredia's mandatory minimum sentence is the 26.2 grams of pure methamphetamine to which the parties have stipulated. Consequently, pursuant to 21 U.S.C. § 841(b)(1)(B)(viii), this court has imposed a mandatory minimum sentence upon defendant Ochoa–Heredia of 5 years. This mandatory minimum sentence supersedes the sentencing range as determined under the otherwise applicable Sentencing Guidelines. *See* U.S.S.G. § 5G1.1(b).

**IT IS SO ORDERED.**

---

15. Similarly, the availability of an "upward departure" on the basis of the sophistication of the medium, while available, *see* U.S.S.G. § 2D1.1, application note 1, is not an appropriate basis for reading the necessity of including unusable or unmarketable mediums into the mandatory minimum sentence calculation. *See Jennings*, 945 F.2d at 136–37 (although the court recognized that the sentencing court could have made an upward departure that equaled or exceeded the mandatory minimum sentence imposed on the basis of the weight of the entire, poisonous mixture, the reviewing court concluded that such a possibility did not excuse the sentencing court's improper calculation for mandatory minimum or base offense purposes). Nor can the court find, from the record, that Ochoa–Heredia should be subjected to such an upward departure, because the court cannot find any indication that he is responsible in some way for the "sophistication" of the manner in which the methamphetamine was carried.